**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE CFO SQUAD, LLC,

                    Plaintiff,

    -against-

LUKE MCPHERSON, ANDRIY MUSHAK, and
NICOLE CENA,

                  Defendants.

**VERIFIED COMPLAINT**

Case No.

**DEMAND FOR JURY TRIAL**

Plaintiff The CFO Squad, LLC ("CFO Squad," the "Company," or "Plaintiff"), by and through its attorneys Davis+Gilbert LLP, for its Complaint against defendants Luke McPherson, Andriy Mushak, and Nicole Cena (collectively, "Defendants"), states as follows:

## NATURE OF THE ACTION

1. This is an action to halt the deceitful and brazen efforts of two of CFO Squad's former trusted executives—McPherson and Mushak, both of whom were in the process of becoming equity partners in the Company—from unlawfully soliciting CFO Squad clients and recruiting and hiring CFO Squad employees since resigning their positions at the Company, in blatant violation of narrowly tailored restrictive covenants they agreed to as part of their employment.

2. Upon information and belief, even prior to their resignations becoming effective, McPherson and Mushak formed a new competitive venture, LMAM Consulting Group LLC ("LMAM").

3. Since LMAM began operations, McPherson and Mushak have sought to financially harm CFO Squad by targeting key clients—including one of CFO Squad's largest clients, NRx

Pharmaceuticals, Inc. ("NRx Pharmaceuticals")—and inducing those clients to take their business away from CFO Squad and give it to LMAM.

4.     To effect this scheme, McPherson and Mushak have misused CFO Squad's confidential information and hired away employees with established client relationships, including Defendant Nicole Cena.  Upon information and belief, Cena is also violating her restrictive covenants by working with LMAM as she is servicing the same clients she serviced while employed by CFO Squad.

5.     The actions of McPherson and Mushak in targeting CFO Squad clients and employees violate their respective restrictive covenants and fiduciary duties, and also constitute tortious interference with CFO Squad's existing contracts, among other claims.

6.     CFO Squad seeks injunctive relief against all of McPherson, Mushak, and Cena, to stop their unlawful conduct and protect CFO Squad's business, as well as damages already suffered due to Defendants' actions to date.

## PARTIES

7.     CFO Squad is a limited liability company duly organized under the laws of the State New York with its principal place of business at 43 Mariner Way, Monsey, New York 10952.

8.     CFO Squad has two members, Joseph Himy and his wife, both of whom are individuals domiciled at 43 Mariner Way, Monsey, New York, 10952.

9.     Upon information and belief, McPherson is an individual domiciled at 492 Caveson Drive, Frisco, Texas 75036-8918.

10.     Upon information and belief, Mushak is an individual domiciled at 11 Anvil Circle, North Andover, Massachusetts 01845-3366.

11.    Upon information and belief, Cena is an individual domiciled at 110 1st Street, Apt. 2D, Jersey City, New Jersey, 07302-8979.

## JURISDICTION AND VENUE

12.    This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest, and the parties are citizens of different states (i.e. there is complete diversity of citizenship between Plaintiff and all Defendants).

13.    This Court has personal jurisdiction over each of the Defendants because each was employed by, and entered into an agreement with, CFO Squad, a limited liability company headquartered in the State of New York.  This case arises from their employment and their obligations pursuant to their applicable protective covenants agreements.  Moreover, in those agreements, CFO Squad and each of the Defendants contractually submitted to the jurisdiction of courts in New York.

14.    Venue properly lies in this Court pursuant to 28 U.S.C. § 1391 because the Company's headquarters and principal place of business are situated within this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district.

15.    Venue also properly lies in this Court pursuant to the parties' consent in the protective covenants agreements.

## FACTUAL ALLEGATIONS

### I.    Background

#### A.    The Parties and their Prior Relationship

16.    CFO Squad is a financial and business advisory firm that provides outsourced chief financial officer advisory, outsourced accounting, and technical accounting consulting services for

3

emerging to mid-sized public and private companies, including audit preparation, financial reporting, technical accounting, bookkeeping, financial modeling, oversight of accounting staff via its CFO advisory or controller, and due diligence services. CFO Squad has expertise across numerous industries including manufacturing, biotechnology, pharmaceutical, software as a service, mining, and telecommunications.

17.    CFO Squad is a small, family-owned company started up largely on the hard work and tenacity of its Founder and Managing Director, Joseph Himy. The vast majority of CFO Squad's client relationships are the result of Himy's contacts, relationships, and hard work.

18.    Himy founded CFO Squad in 2013 and, in the 12 years since then, has grown the Company to a staff of approximately 35.

19.    CFO Squad relies on a team of experienced CFOs, financial reporting specialists, and accountants to meet its clients' needs.

20.    Significant trust is placed in senior executives who are responsible to lead and maintain client relationships while Himy works on continuing to grow the Company. In order to protect CFO Squad's business and client relationships, senior managers and directors are required to agree to a limited protective agreement upon joining the Company.

21.    McPherson was hired by CFO Squad as a Senior Manager on or about July 8, 2022, and was continuously employed at-will from then until he voluntarily resigned effective as of August 29, 2025.

22.    By the time of his resignation, McPherson had been promoted to Director and was part of CFO Squad's executive leadership team. McPherson's duties included overseeing the Company's SEC Reporting department and performing related services for clients including

American Clean Resources Group, Inc., and Dickerson Infrastructure Inc., and assisting with business development initiatives and the proposal process for new client leads.

23.     CFO Squad had also placed McPherson on a special action plan by which he could become an equity partner in the Company and hired a consultant to conduct meetings with McPherson to advance the creation of the action plan.

24.     Mushak was hired by CFO Squad as a Director on or about July 6, 2023, and was continuously employed at-will from then until he voluntarily resigned effective as of September 15, 2025.

25.     By the time of his resignation, Mushak was the head of the Company's Boston office and was part of CFO Squad's executive leadership team.   Mushak's duties included overseeing the SEC Reporting department with McPherson and performing related services for clients including NRx Pharmaceuticals.   In addition to assisting with business development initiatives and with the proposal process for new client leads, CFO Squad hired Mushak for his sales skills (Mushak's employment agreement includes a bonus plan specific to sales objectives).

26.     In connection with Mushak's sales objectives, CFO Squad gave him an open checkbook and encouraged him to develop current clients and attract prospective clients, for which he would be rewarded per his bonus agreement.

27.     CFO Squad had also placed Mushak on a special action plan by which he could become an equity partner in the Company and hired a consultant to conduct meetings with McPherson to advance the creation of the action plan.

28.     Prior to the resignation of McPherson and Mushak, CFO Squad's leadership team consisted of the two of them along with Himy and Jeannine Zimmerman (CFO Squad's Vice President of Operations).

29.     In their roles on the leadership team of CFO Squad, McPherson and Mushak attended regular executive meetings where the team discussed, among other things, the Company's vision for growth in the future, its values, confidential information, employee issues, hiring plans, strategic initiatives, and marketing and sales ideas.

30.     Himy also shared CFO Squad's list of prospective clients and leads with McPherson and Mushak on a regular basis and divided the responsibility of pursuing those new clients among the three of them.

31.     Himy, as a sole owner, further entrusted McPherson and Mushak with his network of contacts, including analysts and consultants that were sometimes engaged by CFO Squad in the course of providing services to clients.

32.     Moreover, as part of CFO Squad's executive leadership team, McPherson and Mushak were provided many client engagement letters and proposals which include confidential information such as a full description of client needs and services being offered along with CFO Squad employee rates.

33.     Client engagement letters were not generally provided to employees of CFO Squad and were stored in electronic folders that had security protections in place that limited access; even McPherson and Mushak only received such documents on a need-to-know basis.

34.     Cena was hired by CFO Squad as a Semi-Senior Accountant on or about April 12, 2023, and was continuously employed at-will from then until she voluntarily resigned effective as of October 7, 2025.

35.     By the time of her resignation, Cena had been promoted to Senior Accountant. Cena's duties included technical accounting services for clients, including NRx Pharmaceuticals.

36.     Cena was not on CFO Squad's leadership team but was directly client-facing—regularly meeting with client executives—and had developed close relationships with clients that she serviced and an extensive understanding of their business, financial information, and needs.

37.     CFO Squad paid a placement fee of 20% of her yearly salary when it hired Cena, totaling approximately $21,000.

**B.    Restrictive Covenants and Defendants' Other Contractual Obligations**

38.     In connection with their hiring, each of the Defendants executed an employment agreement which required them, among other terms, to sign a standard protective covenants agreement as a condition of employment.

39.     Therefore, in connection with their hiring and continued employment by CFO Squad, each of the Defendants executed a "Protective Covenant and Inventions Assignment Agreement".

40.     McPherson executed his employment agreement on July 8, 2022 (the "McPherson Employment Agreement", a true and correct copy of which is annexed as **Exhibit A**).

41.     McPherson also executed his Protective Covenant and Inventions Assignment Agreement on July 8, 2022 (the "McPherson Covenant Agreement", a true and correct copy of which is annexed as **Exhibit B**).

42.     Mushak executed his Employment Agreement on July 6, 2023 (the "Mushak Employment Agreement", a true and correct copy of which is annexed as **Exhibit C**).

43.     The Mushak Employment Agreement provided that Mushak would be eligible for "Incentive Bonus Payments" pursuant to a "New Business Success Program" based on a percentage of revenues from "Introduced Clients".

44.     The New Business Success Program defines "Introduced Client" as:

any company or entity that becomes a client of the Company for the first time during the term of your employment, and enters into a contract with the Company for services, and in respect of which (a) you were the initial contact between the Company and such client, (b) you made the initial introduction between the Company and such client, and (c) you were an integral part of the new business effort that led to such account becoming a client of the Company. An Introduced Client shall not include (x) any account that becomes a client of the Company as a result of a referral from a Company employee or any Company affiliate, even if you were involved in the business pitch to obtain such client, and (y) any company or entity that becomes a client of the Company if such company or entity is then or at any time in the immediate preceding two (2) years was a client of the Company, even if you were involved in the business pitch to obtain such client.

(**Exhibit C**, at p. 4).

45.     Pursuant to the Mushak Employment Agreement, the Company also agreed to pay Mushak a "one-time, first-year bonus of $25,000", to be paid in four installments, which would "constitute a draw against [his] Incentive Bonus Payments" pursuant to the New Business Success Program.  (*Id.* at pp. 1, 4).

46.     Mushak also executed his Protective Covenant and Inventions Assignment Agreement on July 6, 2023 (the "Mushak Covenant Agreement", a true and correct copy of which is annexed as **Exhibit D**).

47.     Cena executed her Employment Agreement on April 12, 2023 (the "Cena Employment Agreement", a true and correct copy of which is annexed as **Exhibit E**, and collectively with the McPherson Employment Agreement and Mushak Employment Agreement, the "Employment Agreements").

48.     Cena also executed her Protective Covenant and Inventions Assignment Agreement on April 12, 2023 (the "Cena Covenant Agreement", a true and correct copy of which is annexed as **Exhibit F**, and collectively with the McPherson Covenant Agreement and Mushak Covenant Agreement, the "Covenant Agreements").

49.     Due to Defendants' respective positions at CFO Squad, and their anticipated direct relationships with clients, pursuant to the Covenant Agreements the Company required Defendants to comply with reasonable restrictions concerning the solicitation or hiring of Company employees and the solicitation or provision of services to CFO Squad clients other than on the Company's behalf, as well as on their use of confidential information received during the course of their employment (collectively, the "Restrictive Covenants").

50.     The Restrictive Covenants include provisions precluding the Defendants from soliciting or servicing clients, soliciting employees, and hiring employees.

51.     Thus, the Restrictive Covenants helped CFO Squad to protect, among other things, its customer relationships, employee relationships, and its confidential information.

52.     Specifically, in the Covenant Agreements, Defendants each agreed, *inter alia*, that during their employment with the Company and for the 24-month period thereafter, they would not:

> (i) attempt in any manner to solicit, persuade or induce any individual, person or entity which is, or at any time during your employment with the Company was, a Client of the Company to terminate, reduce or refrain from renewing or extending its contractual or other relationship with the Company in regard to the purchase of products or services manufactured, marketed or sold by the Company, or to become a Client of or enter into any contractual or other relationship with you or any other individual, person or entity in regard to the purchase of products or services similar or identical to those manufactured, marketed or sold by the Company; or
>
> . . .
>
> (iii) render to or for any Client (whether working as an employee or consultant for such Client or otherwise) any services of the type rendered by the Company; or
>
> (iv) employ as an employee or retain as a consultant any person who is then, or at any time during the preceding twelve (12) months was, an employee of or exclusive consultant to the Company, or persuade or attempt to persuade any employee of or exclusive consultant to the Company to leave the employ of the

Company or to become employed as an employee or retained as a consultant by anyone other than the Company.

(**Exhibits B, D, and F**, at ¶ 3(a)).

53.    "Client", for purposes of the Restrictive Covenants, is defined as any client of CFO Squad as of the time of an employee's termination of employment or in the twelve months preceding such date, but only if the employee "had a direct relationship with, supervisory responsibility for or otherwise [was] involved with such client during [his/her] employment with the Company". (*See* **Exhibits B, D, and F**, at ¶ 3(b)).

54.    Thus, the Restrictive Covenants would not broadly preclude any competition by the Defendants but merely restrict them, vis-à-vis CFO Squad clients, from soliciting and servicing those clients which a Defendant was involved with while employed by CFO Squad.

55.    The Restrictive Covenants, as they concern protection of CFO Squad's client relationships, were designed to protect the investment that CFO Squad made to acquire new clients and to learn its clients' businesses, financial information, and needs.

56.    The Restrictive Covenants, as they concern protection of CFO Squad's employee relationships, were designed to protect the investment that CFO Squad made in recruiting, hiring (including, often, payment of a placement fee), and training its employees (many of whom came from an audit background and needed to be taught how to provide the services offered by CFO Squad) as well as protect the client-specific knowledge gained through servicing CFO Squad's clients.

57.    The Restrictive Covenants were narrowly tailored to protect from poaching clients with whom a relationship existed while employed by CFO Squad and from taking employees.

58.    Accordingly, the Restrictive Covenants are reasonable in scope and are directed at preventing unfair competition.

59.     Indeed, Defendants expressly acknowledged that "the rendering of services to the Company's clients, many of which are long-term clients that have been clients of the Company for several years, necessarily requires the disclosure of confidential information and trade secrets of the Company" and further agreed that "during [their] employment by the Company, and after it ends, [they would] keep confidential and not disclose the Confidential Information [as defined in the Covenant Agreements] to anyone or use it for [their] own benefit or for the benefit of others, except in rendering services as an employee of the Company."  (**Exhibits B, D, and F**, at ¶¶ 1(a), 3(a)).

60.     In the Covenant Agreements, Defendants each agreed that monetary remedies at law for a breach would be inadequate and that accordingly, the Company would be entitled to equitable relief in the form of specific performance and injunctive relief.  (**Exhibits B, D, and F**, at ¶ 4).  Defendants expressly agreed that the Company would be entitled to such equitable relief without having to prove the inadequacy of the available remedies at law.  (*Id.*).

61.     The McPherson and Mushak Covenant Agreements also provided that the Company could recover its legal fees incurred as a result of a breach of the Restrictive Covenants, including fees seeking injunctive relief and/or monetary damages.  (**Exhibit B and D,** at ¶ 4).

62.     Defendants also agreed that while employed by the Company they would have "an undivided duty of loyalty and fair dealing to the Company" and would "not take over any of the Company's business opportunities or prospective business opportunities for [their] personal gain and/or to the detriment of the Company."  (**Exhibits B, D, and F**, at ¶ 2).

**II.    Defendants' Violation of Their Restrictive Covenants and Fiduciary Duties**

    **A.    Formation of LMAM and Defendants' Coordinated Resignation from the Company**

63.    Upon information and belief, prior to their resignations, McPherson and Mushak plotted to launch LMAM, a competitor financial and regulatory consulting firm that operates, like CFO Squad, through a network of financial professionals in conjunction with in-house accountants.

64.    To that end, on August 10, 2025, LMAM was registered as a new entity organized under the laws of the state of Texas (a true and correct copy of the Certificate of Formation Limited Liability Company (the "LMAM Certificate"), obtained from the Office of the Secretary of State of Texas, is attached as **Exhibit G**).[1]

65.    Pursuant to the LMAM Certificate, the two officers of LMAM are McPherson and Mushak and, upon information and belief, LMAM's address is the same as McPherson's residence.

66.    Upon information and belief, the name "LMAM" is a composite of the initials for "Luke McPherson" and "Andriy Mushak."

67.    Upon information and belief, LMAM (and LMAM Holding) were both registered prior to either of McPherson or Mushak's resignations becoming effective.

68.    McPherson resigned his employment with the Company on August 4, 2025, in an oral communication to Himy, to be effective September 30, 2025.

69.    At the time of McPherson's resignation, he represented to the Company that he was going to work for another company that was not a client of—indeed had no relationship with—CFO Squad.

---

[1] A week prior, on August 3, 2025, McPherson registered another entity, LMAM Consulting Group Holding LLC ("LMAM Holding").

70.    Based on McPherson's representations, CFO Squad worked with McPherson to ensure an amicable departure and ease his transition.

71.    To that end, CFO Squad proposed expediting the separation process (allowing McPherson to take vacation between jobs) and, with McPherson's consent and approval, the parties terminated McPherson's employment as of August 29, 2025.

72.    Mushak resigned his employment with the Company on August 8, 2025, in an oral communication to Himy, to be effective September 30, 2025.

73.    Himy had no knowledge the Mushak intended to continue servicing CFO Squad clients and believed the departure was amicable.

74.    To that end, CFO Squad proposed expediting the separation process and, with Mushak's consent and approval, the parties terminated Mushak's employment as of September 15, 2025.

75.    Only later did Himy and CFO Squad learn that McPherson and Mushak were instead forming a competing venture and that they intended to misappropriate Company employees and clients.

76.    Upon information and belief, McPherson and/or Mushak have staffed and continue to staff LMAM by hiring former CFO Squad employees.

77.    For example, on September 26, 2025, Cena submitted her resignation, effective October 7, 2025.  Upon information and belief, Cena began working with LMAM on or about October 9, 2025.

78.    Upon information and belief, Cena, who worked predominantly with Mushak at CFO Squad, is currently providing services to LMAM either as an employee or consultant, as she now has an LMAM email address (ncena@lmamconsulting.com).

79.     At least one additional employee, Logan Schmitz, who worked predominantly with McPherson, has recently resigned and, upon information and belief, has been or will be hired by LMAM.

80.     CFO Squad paid a placement fee of 20% of his yearly salary when it hired Schmitz, totaling approximately $20,000.

81.     Upon information and belief, McPherson and Mushak have thus failed to honor the Restrictive Covenants which restrict them, for 24 months after their departures, from soliciting or hiring Company employees.

82.     Upon information and belief, McPherson and/or Mushak have persuaded or attempted to persuade Company employees, including Cena and Schmitz, to resign from CFO Squad and to become employed by LMAM.

83.     Upon information and belief, McPherson and/or Mushak have contacted other Company employees, potentially in violation of their Restrictive Covenants.

**B.     Defendants' Campaign to Misappropriate CFO Squad Clients**

84.     Even more deleterious than McPherson and Mushak's poaching of employees has been Defendants' targeted attack on CFO Squad's client base.

85.     As of the date of the filing of this Complaint, CFO Squad is aware of at least four clients and one prospective client who, upon information and belief, have engaged LMAM.[2]

86.     Upon information and belief, these clients are using LMAM for the same or similar types of services that were previously provided by CFO Squad.

---

[2] Shortly after McPherson resigned, one of CFO Squad's clients asked for a limited waiver of its contractual restrictions on engaging CFO Squad employees or ex-employees and sought to use McPherson for the purpose of him providing guidance throughout a critical financial period.  In respect of the client's needs, CFO Squad granted the waiver, noting that it was a limited one-time waiver and applied solely to the specific situation without extending to any of McPherson's other commitments to CFO Squad or to any other clients.

87.    Upon information and belief, LMAM generally provides the same type of outsourced advisory and consulting services as CFO Squad and operates on the same business model, leveraging a network of CFOs and financial reporting advisors to integrate with LMAM's internal accounting team to provide regulatory consulting services to public and private companies, including financial reporting and compliance services.

88.    In particular, LMAM's website (https://lmamconsulting.com (the "LMAM Website") asserts that LMAM has expertise supporting CFOs of both public and private companies (a true and correct web capture of the About page of the LMAM Website, as of 5:00 p.m. Eastern Standard Time, October 20, 2025, is attached as **Exhibit H**).

89.    The LMAM Website further asserts that the reporting solutions offered by LMAM include "SEC Reporting", "Technical Accounting", "IPO and SEC Expertise", "Audit Readiness", "SEC Comment Letter", "Bookkeeping and Reporting", and "M&A and Due Diligence". (**Exhibit H**).

90.    On or about October 2, 2025, NRx Pharmaceuticals terminated its contractual relationship with the Company citing its intention to continue working with Mushak.

91.    Mushak had a direct relationship with and supervisory responsibility for NRx Pharmaceuticals during his employment with CFO Squad.

92.    Upon information and belief, pursuant to a conversation with NRx's CFO, Mushak told NRx Pharmaceuticals he could render services to NRx Pharmaceuticals, through LMAM, after his departure from CFO Squad.

93.    Upon information and belief, NRx Pharmaceuticals is now obtaining similar, if not identical, services from LMAM, including from Mushak and Cena.

94.     Cena had a direct relationship with NRx Pharmaceuticals during her employment with CFO Squad.

95.     Indeed, in 2025, prior to her resignation, Cena devoted a significant amount of her working hours to servicing NRx Pharmaceuticals.

96.     CFO Squad learned that Cena is rendering services to NRx Pharmaceuticals of the type the Company provided because, on October 9, 2025, NRx Pharmaceuticals inadvertently included a current CFO Squad employee on an email to Cena at her LMAM email address.

97.     That email shows a cancelled meeting regarding "Payroll/Insperity".

98.     Upon information and belief, Insperity refers to the Human Resources support and technology company Insperity, Inc.

99.     Such services are nearly identical to the services that CFO Squad—specifically Mushak and Cena—was providing to NRx Pharmaceuticals, including bookkeeping services, controllership and CFO advisory services (which covers payroll processing), financial reporting services, and technical accounting services.

100.    CFO Squad made a significant investment in its client relationship with NRx Pharmaceuticals.

101.    Because of the high volume of services being provided to NRx Pharmaceuticals, particularly in summer 2025, and because of the time Cena devoted to servicing that relationship, CFO Squad faced a staffing crunch.  As a result, CFO Squad was delayed in providing services to other clients.

102.    Moreover, NRx Pharmaceuticals represented a tremendous opportunity for revenue growth to CFO Squad as there was an anticipated need by NRx Pharmaceuticals to expand the

scope and types of services needed.  As a result, CFO Squad did not focus on pursuing other potential new client relationships.

103.    To address those situations and to provide NRx Pharmaceuticals with expertise related to its particular lines of business, in the second quarter of 2025, CFO Squad hired three experienced director-level individuals with specific areas of technical knowledge.

104.    CFO Squad paid a placement fee of 20% of the yearly salary for two of the newly hired employees, totaling approximately $85,000.

105.    Previously, CFO Squad had invested in building a relationship with Michael Abrams, who would go on to become the CFO of NRx Pharmaceuticals.  Prior to providing services NRx Pharmaceuticals, CFO Squad had provided nearly $100,000 worth of services to Arch Therapeutics—where Abrams previously served as CFO—until Arch went bankrupt, causing CFO Squad to recover nothing.

106.    CFO Squad was invoicing NRx Pharmaceuticals approximately $35,000-$50,000 per month, all of which revenue has been lost.

107.    Since the start of the year, CFO Squad has invoiced NRx Pharmaceuticals a total of $529,835.49 for services provided.

108.    As a result of Mushak and the other Defendants' efforts, NRx Pharmaceuticals altogether ceased using CFO Squad resulting in a loss of approximately $150,000-$200,000 in anticipated revenues for the remainder of 2025 (as contemplated by NRx Pharmaceuticals' engagement letter), and all revenues in 2026 and going forward.

109.    NRx Pharmaceuticals represented approximately 7.5% of CFO Squad's revenues for 2025, and had the potential to comprise a much greater share of revenues in 2026 and going

forward because of anticipated increased business related to NRx Pharmaceuticals' planned operations.

110.    As a result of Mushak and LMAM misappropriating the NRx business, CFO Squad now faces a situation where its newly hired employees have excess capacity, further damaging the Company.

111.    In contrast to the damages suffered by CFO Squad, LMAM has taken a short cut to profitability by avoiding the expenses of hiring and training employees to service NRx Pharmaceuticals.

112.    Upon information and belief, NRx Pharmaceuticals' termination of its relationship with CFO Squad resulted from McPherson's and Mushak's scheme to lure lucrative clients away from the Company.

113.    Regardless of whether Mushak had a personal relationship with NRx Pharmaceuticals or any of its principals prior to NRx Pharmaceuticals becoming a client of CFO Squad, he was prohibited from providing services to NRx Pharmaceuticals after resigning from the Company pursuant to the Restrictive Covenants.

114.    Namely, CFO Squad and Mushak expressly contemplated that he would bring in new clients including by using his network of contacts—indeed, a significant consideration in hiring Mushak was the prospect of him bringing in new business—and agreed to a bonus structure to compensate him for doing so, advancing $25,000 of such bonuses starting at the time of his hiring.

115.    Another client (referred to herein as "Client #2" for confidentiality purposes) is also apparently working with Mushak at LMAM (although it has not formally terminated its relationship with CFO Squad as of the date of this filing).

116.    Upon information and belief, Mushak and LMAM are providing services to Client #2 similar to those previously provided by Mushak while he was employed by CFO Squad.

117.    Mushak had a direct relationship with and supervisory responsibility for the Client #2 relationship during his employment with CFO Squad.

118.    On September 24, 2025, Mushak—ten days after his resignation from CFO Squad was effective—emailed the CEO of Client #2 with an "engagement letter" for a "consulting arrangement", using Mushak's LMAM email address.

119.    In that email, Mushak wrote that he was "very much looking forward to continuing our work together with you[] and the [Client #2] team once again."

120.    Since Client #2 began working with CFO Squad in October 2023, CFO Squad has invoiced Client #2 for $768,323.37 for services provided.  In 2025 alone, Client #2 was responsible for $479,953.02 of CFO Squad revenues.

121.    As a result of Mushak and the other Defendants' efforts, CFO Squad is at risk of losing business from Client #2.

122.    Upon information and belief, Defendants have also attempted to solicit American Clean Resource Group, Inc. ("American Clean"), a Company client, to terminate or reduce its relationship with CFO Squad.

123.    Upon information and belief, McPherson and LMAM are providing services to American Clean similar to those previously provided by McPherson while he was employed by CFO Squad.

124.    McPherson had a direct relationship with and supervisory responsibility for the American Clean relationship during his employment with CFO Squad.

125.    Since February 25, 2025, CFO Squad performed services for American Clean in the areas of pre-audit and financial reporting, technical accounting, and tax preparation and compliance.

126.    However, since McPherson's departure, American Clean is now only using CFO Squad for tax preparation services.

127.    Also since McPherson's departure, American Clean removed CFO Squad's access to American Clean's QuickBooks account.

128.    Prior to McPherson's departure, American Clean engaged CFO Squad to assist with financial reporting on a quarterly basis.  Upon information and belief, American Clean does not have the capability of preparing financial reports without assistance; yet, with a 10-Q due on or about November 15, 2025, American Clean has not asked CFO Squad to prepare the filing.

129.    Relatedly, on or about September 5, 2025, American Clean's CEO informed CFO Squad of its intent to have McPherson continue rendering services to American Clean.

130.    On October 2, 2025, AJ Miller at American Clean emailed McPherson at his CFO Squad email address referring to an "urgent need for tax purposes" and requesting certain documentation.  On October 6, 2025, Miller asked if McPherson was "able to send something to [him] today."

131.    In contrast, American Clean has largely stopped responding to emails from Himy regarding the account and any continued services to be provided by CFO Squad.

132.    Since American Clean began working with CFO Squad in February 2025, CFO Squad has invoiced American Clean for $140,475 for services provided, including $10,000 per month for financial reporting services.

133.    As a result of McPherson's and the other Defendants' efforts, American Clean has reduced its use of CFO Squad resulting in a loss of $10,000 per month in anticipated revenues for the remainder of 2025, and over $60,000 in revenues in 2026 and going forward.

134.    Another client, Dickerson Infrastructure Inc. ("Dickerson"), also recently ceased doing business with CFO Squad.

135.    The Company began performing services for Dickerson on or about July 20, 2021, in areas including, but not limited to, technical accounting and financial statement services, SEC compliance services, and pre-audit services.

136.    Throughout 2025, and before that, the Company provided advisory services to Dickerson when Dickerson contacted the Company.

137.    Although Dickerson has not formally terminated its relationship with CFO Squad, since McPherson's departure in August 2025, Dickerson has not contacted CFO Squad to provide advisory, or any other, services.

138.    Upon information and belief, like NRx Pharmaceuticals, Client #2, and American Clean, Dickerson is now engaging Defendants, through LMAM, for services like those previously provided by CFO Squad.

139.    McPherson had a direct relationship with and supervisory responsibility for the Dickerson relationship during his employment with CFO Squad.

140.    CFO Squad learned that Dickerson is working with McPherson at LMAM because, on October 1, 2025, Dickerson's CEO inadvertently copied McPherson at his old CFO Squad email address in an email chain regarding an upcoming accounting meeting, and again on October 8, 2025, and October 10, 2025, in communications regarding financial agreements and projections.

141.    Such services are nearly identical to the services that CFO Squad—specifically McPherson—was providing to Dickerson, including financial reporting and technical accounting.

142.    Since Dickerson began working with CFO Squad in July 2021 CFO Squad has invoiced Dickerson for $474,502.50 for services provided.

143.    As a result of McPherson and the other Defendants' efforts, Dickerson altogether ceased using CFO Squad, resulting in a loss of $2,000-$5,000 per month in anticipated revenues for the remainder of 2025, and all revenues in 2026 and going forward.

144.    Upon information and belief, McPherson and/or Mushak have contacted other Company clients, potentially in violation of their Covenant Agreements.

145.    Upon information and belief, McPherson solicited a prospective client of the Company, Royalty Management Holding Corporation ("Royalty Management") and/or related entities.

146.    Upon information and belief, Royalty Management is now engaging Defendants, through LMAM, for services like those offered by CFO Squad, including financial reporting services.

147.    The Covenant Agreements prohibit Defendants from taking over prospective business opportunities of the Company for personal gain and soliciting any Client of the Company or from rendering to or for any Client . . . any services of the type rendered by the Company. (**Exhibits B, D, and F,** at ¶¶ 2, 3(a)(i), (iii)).

148.    The Covenant Agreements define "Client" to include certain prospective clients.

149.    On July 29, 2025, prior to McPherson's resignation from CFO Squad, a client of the Company referred Royalty Management to CFO Squad as a "potential client", directing the

referral to McPherson.  McPherson forwarded the referral to Himy stating, "[w]e need to figure out who can help out with all these new clients."

150.    Just days later, McPherson and Mushak registered LMAM as a new entity, and McPherson gave CFO Squad notice of his resignation.  McPherson did not pursue engaging Royalty Management as a client of the Company.

151.    However, on September 11, 2025, about one month after McPherson's resignation, the CEO of Royalty Management inadvertently emailed McPherson at his CFO Squad email address writing, "[t]hanks for the help on the Form 10 – much appreciated."

152.    Royalty Management and other prospective clients appeared on a confidential list of client leads that the Company shared with McPherson and Mushak by virtue of their positions as Directors and as part of the leadership team at CFO Squad.

153.    Further, McPherson was aware of and participated in discussions with Himy concerning Royalty Management's business.

154.    Upon information and belief, CFO Squad may have generated $10,000-$20,000 in monthly anticipated revenues from Royalty Management's business.

155.    Upon information and belief, McPherson and/or Mushak have contacted other prospective Company client leads, potentially in violation of their Covenant Agreements.

156.    Upon information and belief, Defendants further intend to solicit Company employees and clients and to render services to clients in violation of the Restrictive Covenants.

C.    **Defendants' Tortious Interference**

157.    Defendants have also tortiously interfered with various CFO Squad contracts.

158.    First, each of the Covenant Agreements contain the Restrictive Covenants and confidentiality obligations, which Defendants have induced breaches of through the recruitment of CFO Squad clients and employees.

159.    Upon information and belief, Defendants continue to induce Company employees to breach their respective employment agreements with the Company by joining LMAM and servicing Company clients.

160.    Further, by soliciting NRx Pharmaceuticals, Dickerson, Client #2, and American Clean to terminate their agreements or reduce the scope of their services with CFO Squad—agreements and relationships Defendants were well aware of by virtue of their employment with CFO Squad and their performing services for such clients while employed by CFO Squad—Defendants intentionally interfered with CFO Squad's contracts.

161.    Defendants' interference is improper because it is in breach of Defendants' restrictive covenants and, upon information and belief, Defendants used confidential Company information to solicit such clients.

162.    Moreover, the CFO Squad's contracts with NRx Pharmaceuticals, Client #2, American Clean, and Dickerson contain provisions restricting direct or indirect hire of any employee of the Company.  By providing services to these companies, Defendants are inducing breaches of CFO Squad's contracts by those clients.

**D.    Defendants' Misappropriation of Confidential Information**

163.    Over the past few years, the Company has invested significant time, money, and effort into training McPherson and Mushak and supporting their growth by bringing them onto the leadership team of CFO Squad.

164.    Further, CFO Squad hired a consultant to create a partnership action plan for each of McPherson and Mushak.

165.    McPherson began as a Senior Manager and was promoted to Director, and Mushak was hired as a Director at the Company.  By the time of their respective resignations, as Directors, McPherson and Mushak were members of the four-person leadership team of CFO Squad.

166.    In these Director positions, McPherson and Mushak had insight into nearly every facet of CFO Squad's operations and were privy to highly valuable confidential information.

167.    Collectively, McPherson and Mushak had access to at least the following categories of confidential information: (a) client lead lists; (b) engagement letters which contained, *inter alia*, pricing and staffing structure information; and (c) information about employees, compensation, and incentives.

168.    The Company regularly provided McPherson and Mushak access to confidential lead lists for the purposes of assigning them leads to pitch and/or develop for the benefit of CFO Squad.

169.    The Company regularly shared its lead list with McPherson and Mushak which contained lead information for, among others, Royalty Management.

170.    Upon information and belief, less than one month after McPherson's resignation, McPherson began rendering services to Royalty Management, like those offered by CFO Squad.

171.    Upon information and belief, McPherson and/or Mushak have used the Company's confidential lead list, which they had access to only by virtue of their roles at CFO Squad, to solicit and or render services to other prospective clients of the Company.

172.    CFO Squad has diligently taken reasonable precautions to preserve its confidential and proprietary information from disclosure or use by third parties, including, but not limited to, limitations on the dissemination of this information on a need-to-know basis, the use of employee confidentiality agreements (like the Covenant Agreements), and immediate termination of access

to the Company's confidential information after an employee ends his or her employment with the Company.

173.    As discussed above, the Company required the Defendants to enter into the Covenant Agreements which included stringent confidentiality provisions (Paragraph 1 of the Covenant Agreements) to prevent Defendants from the unauthorized disclosure or use of the Company's confidential information.

174.    As a Senior Accountant at the time of her resignation, Cena was also privy to highly valuable confidential information, particularly concerning clients like NRx Pharmaceuticals.

175.    Moreover, McPherson and Mushak, had full and complete access to information related to the Company's work for the clients, including the Company's and the client's sensitive confidential information.

176.    Upon information and belief, Defendants have used the Company's confidential client lead information to pitch and secure clients for LMAM.

177.    Upon information and belief, Defendants have used Company confidential salary and cost information to assess what to pay LMAM's new employees as well as the fees LMAM would charge its clients for services.

178.    Upon information and belief, Defendants have used the Company's confidential information to provide services to clients.

179.    McPherson and Mushak have taken these actions despite CFO Squad and Himy entrusting them with the Company's most sensitive information, elevating them to CFO Squad's small leadership team, and putting action plans in place to make McPherson and Mushak equity partners in the Company.

180.    McPherson, Mushak, and Schmitz have, as of the time of this filing, retained their Company-issued computer which, upon information and belief, contains confidential CFO Squad information and documents.

**E.    Impact of Defendants' Actions on CFO Squad**

181.    Defendants' actions in poaching CFO Squad clients and employees has had, and continues to have, a significant impact on the Company.

182.    When employees have previously ended their employment with CFO Squad, there have not been coordinated losses of clients or employees.

183.    Accordingly, the current situation has been demoralizing for employees who remain with CFO Squad, particularly when they have been contacted by departing clients to assist in transitioning business away from CFO Squad.

184.    As a result of losing four employees in a short time, including two members of the executive leadership team, CFO Squad has been forced to quickly adjust its management and operations.

185.    Because each of McPherson, Mushak, and Cena also serviced other CFO Squad clients, those client relationships have also been impacted in unknowable ways and have necessitated the Company to quickly staff replacements.

186.    But finding replacements for the departed employees has been costly—including necessitating further placement fees—and time-consuming for Himy and Zimmerman.

187.    One specific area that has suffered is the development and retention of new clients, a task that Himy had previously shared with McPherson and Mushak.  As a result, Defendants' actions are likely to have a greater effect on the Company than merely the loss of client business, which alone is material.

188.    Himy estimates that the valuation of CFO Squad has decreased by approximately $2,000,000 as a result of Defendants' actions to date, based on more than $1,000,000 of lost annual revenues.

189.    In short, the impact of Defendants' actions to date has been significantly detrimental to CFO Squad and its profitability and would be devastating if Defendants are allowed to continue poaching CFO Squad clients and employees.

### FIRST CAUSE OF ACTION
**(Breach of Contract—Against McPherson)**
**(For Injunctive Relief and Monetary Damages)**

190.    The Company repeats and realleges each and every allegation contained in the paragraphs above as though set forth herein.

191.    The McPherson Covenant Agreement is a fully executed, valid, and binding agreement.

192.    The Company fully performed its obligations pursuant to the McPherson Covenant Agreement.

193.    Beyond meeting its obligations in employing McPherson, CFO Squad had elevated him to the leadership team and placed him on an action plan to make equity partner, entrusting him with sensitive and confidential information in doing so.

194.    The Restrictive Covenants in the McPherson Covenant Agreement are valid and enforceable as they are reasonable in time and area, necessary to protect the Company's legitimate interests, not harmful to the public and not unreasonably burdensome to McPherson.

195.    In particular, the Restrictive Covenants in the McPherson Covenant Agreement do not prevent McPherson from competing with CFO Squad, generally, but merely bar McPherson from misappropriating the client relationships with which he had personal involvement while employed by CFO Squad.

196.    The Restrictive Covenants also prevent McPherson from poaching CFO Squad employees.

197.    McPherson expressly agreed that the Restrictive Covenants are reasonable and necessary to protect the goodwill and business of the Company.

198.    The Restrictive Covenants are directed at preventing unfair competition by McPherson (directly or indirectly, such as through LMAM).

199.    The Restrictive Covenants in the McPherson Covenant Agreement were in effect during the entire period of McPherson's employment with CFO Squad.

200.    McPherson resigned from CFO Squad effective August 29, 2025; therefore, the Restrictive Covenants are currently in effect and will remain in effect until August 29, 2027.  The confidentiality provision contained in the McPherson Covenant Agreement is perpetual.

201.    Upon information and belief, in the period since his departure from CFO Squad, McPherson has rendered services to and/or solicited clients of the Company, including but not limited to Dickerson and American Clean.

202.    Upon information and belief, in the period since his departure from CFO Squad, McPherson has hired employees of the Company, including but not limited to Mushak and Cena.

203.    Upon information and belief, as a direct and proximate cause of McPherson's conduct, at least four clients of the Company have terminated or modified their contractual relationship with the Company.

204.    Upon information and belief, as a direct and proximate cause of McPherson's conduct, Mushak, Cena, and at least one other employee has resigned from CFO Squad.

205.    Upon information and belief, at least one prospective client of CFO Squad has done business with McPherson and LMAM despite McPherson agreeing not to take over any of the Company's prospective business opportunities for his personal gain.

206.    By these actions, McPherson breached the Restrictive Covenants, and the McPherson Covenant Agreement, by servicing clients and prospective clients, and hiring and/or soliciting employees.

207.    Per the terms of the McPherson Covenant Agreement, McPherson acknowledged that violation thereof would entitle CFO Squad to injunctive relief to prevent breaches or threatened breaches and to specific performance, including of each of the Restrictive Covenants.

208.    Upon information and belief, and as a result of McPherson's conduct, the Company has suffered and will continue to suffer irreparable harm.  CFO Squad has already lost clients to McPherson and his new entity, LMAM.  If not enjoined, upon information and belief, McPherson will likely induce additional breaches of the McPherson Covenant Agreement and violations of the Restrictive Covenants, which will result in further damages and additional irreparable harm to the Company.  Injunctive relief is necessary as the Company is without an adequate remedy at law to prevent the harm of loss of clients and good will, which will have lasting effects on the future of the Company and will take significant time to recover from, if ever.

209.    As a direct and proximate result of McPherson's breaches, CFO Squad has suffered and will continue to suffer irreparable harm including the loss of existing clients and associated good will.

210.    Further and additionally, CFO Squad has been damaged in an amount to be determined at trial but at least $1,000,000 in lost annual revenues.

## SECOND CAUSE OF ACTION
### (Breach of Contract—Against Mushak)
### (For Injunctive Relief and Monetary Damages)

211.    The Company repeats and realleges each and every allegation contained in the paragraphs above as though set forth herein.

212.    The Mushak Covenant Agreement is a fully executed, valid, and binding agreement.

213.    The Company fully performed its obligations pursuant to the Mushak Covenant Agreement.

214.    Beyond meeting its obligations in employing Mushak, CFO Squad had elevated him to the leadership team and placed him on an action plan to make equity partner, entrusting him with sensitive and confidential information in doing so.

215.    The Restrictive Covenants in the Mushak Covenant Agreement are valid and enforceable as they are reasonable in time and area, necessary to protect the Company's legitimate interests, not harmful to the public and not unreasonably burdensome to Mushak.

216.    In particular, the Restrictive Covenants in the Mushak Covenant Agreement do not prevent McPherson from competing with CFO Squad, generally, but merely bar Mushak from misappropriating the client relationships with which he had personal involvement while employed by CFO Squad.

217.    The Restrictive Covenants also prevent Mushak from poaching CFO Squad employees.

218.    Mushak expressly agreed that the Restrictive Covenants are reasonable and necessary to protect the goodwill and business of the Company.

219.    The Restrictive Covenants are directed at preventing unfair competition by Mushak (directly or indirectly, such as through LMAM).

220.    The Restrictive Covenants in the Mushak Covenant Agreement were in effect during the entire period of Mushak's employment with CFO Squad.

221.    Mushak resigned from CFO Squad effective September 15, 2025; therefore, the Restrictive Covenants are currently in effect and will remain in effect until September 15, 2027. The confidentiality provision contained in the Mushak Covenant Agreement is perpetual.

222.    Upon information and belief, in the period since his departure from CFO Squad, Mushak has rendered services to and/or solicited clients of the Company, including but not limited to NRx Pharmaceuticals and Client #2.

223.    Upon information and belief, in the period since his departure from CFO Squad, Mushak has hired employees of the Company, including but not limited to Cena.

224.    Upon information and belief, as a direct and proximate cause of Mushak's conduct, at least four clients of the Company have terminated or modified their contractual relationship with the Company.

225.    Upon information and belief, as a direct and proximate cause of Mushak's conduct, Cena, and at least one other employee has resigned from CFO Squad.

226.    By these actions, Mushak breached the Restrictive Covenants by servicing clients, and hiring and/or soliciting employees.

227.    Per the terms of the Mushak Covenant Agreement, Mushak acknowledged that violation of the Restrictive Covenants would entitle CFO Squad to injunctive relief to prevent breaches or threatened breaches of the Restrictive Covenants and to specific performance of each of the Restrictive Covenants.

228.    Upon information and belief, and as a result of Mushak's conduct, the Company has suffered and will continue to suffer irreparable harm.  CFO Squad has already lost clients to Mushak and his new entity, LMAM.  If not enjoined, upon information and belief, Mushak will likely induce additional breaches of the Mushak Covenant Agreement and violations of the Restrictive Covenants, which will result in further damages and additional irreparable harm to the Company.  Injunctive relief is necessary as the Company is without an adequate remedy at law to prevent the harm of loss of clients and good will which will have lasting effects on the future of the Company and will take significant time to recover from, if ever.

229.    As a direct and proximate result of Mushak's breaches, CFO Squad has suffered and will continue to suffer irreparable harm including the loss of existing clients and associated good will.

230.    Further and additionally, CFO Squad has been damaged in an amount to be determined at trial but at least $1,000,000 in lost annual revenues.

### THIRD CAUSE OF ACTION
### (Breach of Contract—Against Cena)
### (For Injunctive Relief and Monetary Damages)

231.    The Company repeats and realleges each and every allegation contained in the paragraphs above as though set forth herein.

232.    The Cena Covenant Agreement is a fully executed, valid, and binding agreement.

233.    The Company fully performed its obligations pursuant to the Cena Covenant Agreement.

234.    The Restrictive Covenants in the Cena Covenant Agreement are valid and enforceable as they are reasonable in time and area, necessary to protect the Company's legitimate interests, not harmful to the public and not unreasonably burdensome to Cena.

235.    In particular, the Restrictive Covenants in the Cena Covenant Agreement do not prevent Cena from competing with CFO Squad, generally, but merely bar Cena from misappropriating the client relationships with which she had personal involvement while employed by CFO Squad.

236.    Cena expressly agreed that the Restrictive Covenants are reasonable and necessary to protect the goodwill and business of the Company.

237.    The Restrictive Covenants are directed at preventing unfair competition by Cena (directly or indirectly, such as through LMAM).

238.    The Restrictive Covenants in the Cena Covenant Agreement were in effect during the entire period of Cena's employment with CFO Squad.

239.    Cena resigned from CFO Squad effective October 7, 2025; therefore, the Restrictive Covenants are currently in effect and will remain in effect until October 7, 2027.  The confidentiality provision contained in the Cena Covenant Agreement is perpetual.

240.    Upon information and belief, in the period since his departure from CFO Squad, Cena has rendered services to clients of the Company, including but not limited to NRx Pharmaceuticals, a client with which she had direct contact with while working at CFO Squad.

241.    Upon information and belief, as a direct and proximate cause of Cena's conduct, clients of the Company, including but not limited to NRx Pharmaceuticals, have terminated or modified their contractual relationship with the Company.

242.    By these actions, Cena breached the Restrictive Covenants by servicing clients.

243.    Per the terms of the Cena Covenant Agreement, Cena acknowledged that violation of the Restrictive Covenants would entitle CFO Squad to injunctive relief to prevent breaches or

threatened breaches of the Restrictive Covenants and to specific performance of each of the Restrictive Covenants.

244.    Upon information and belief, and as a result of Cena's conduct, the Company has suffered and will continue to suffer irreparable harm.  Injunctive relief is necessary as the Company is without an adequate remedy at law to prevent the harm of loss of clients and good will which will have lasting effects on the future of the Company and will take significant time to recover from, if ever.

245.    As a direct and proximate result of Cena's breaches, CFO Squad has suffered and will continue to suffer irreparable harm including the loss of existing clients and associated good will.

246.    Further and additionally, CFO Squad has been damaged in an amount to be determined at trial but at least $750,000 in lost annual revenues.

## FOURTH CAUSE OF ACTION
**(Breach of Fiduciary Duty / Faithless Servant Doctrine—Against McPherson and Mushak)**
**(For Monetary Damages and Disgorgement of Gains)**

247.    The Company repeats and realleges each and every allegation contained in the paragraphs above as though set forth herein.

248.    As members of the leadership team of CFO Squad, McPherson and Mushak had a fiduciary duty to CFO Squad, including a duty of loyalty.

249.    Such a duty of loyalty was also due as a result of placing McPherson and Mushak on a special partnership plan.

250.    In their Covenant Agreements, McPherson and Mushak agreed that during their employment with the Company they "have an undivided duty of loyalty and fair dealing to the Company and will work for the best interests of the Company and not take over any of the

Company's business opportunities or prospective business opportunities for my personal gain and/or to the detriment of the Company."  (**Exhibits B, D, and F**, at ¶ 2(a)).

251.    In their Agreements, McPherson and Mushak further agreed that they would not engage in activities that conflict with their obligations to the Company.  (**Exhibits B, D, and F**, at at ¶ 2(c)).

252.    McPherson and Mushak breached their fiduciary duties by, upon information and belief, acting in furtherance of a competing venture, plotting to provide services of a similar type performed by the Company on behalf of LMAM, soliciting CFO Squad employees to resign from the Company, and taking over prospective business opportunities of the Company, all during their employment with CFO Squad and in order to enrich themselves and LMAM at the expense of the Company.

253.    LMAM was formed prior to McPherson and Mushak resigning from CFO Squad.

254.    Upon information and belief, within days after McPherson's resignation from CFO Squad, LMAM began to render services of the type provided by CFO Squad, solicit employees of the Company, and solicit Clients.

255.    Upon information and belief, and as a direct and proximate result of McPherson's and Mushak's conduct, the Company has suffered direct and consequential damages, and is entitled to recover compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

256.    In addition to any other damages, McPherson and Mushak should disgorge any and all compensation that the Company paid to McPherson and Mushak during their periods of disloyalty to the Company, including salaries, bonuses, vacation time, and benefits, in an amount to be determined at trial.

257.    As the LMAM Certificate shows, McPherson and Mushak created a competitor business to CFO Squad at least by August 10, 2025.

258.    Upon information and belief, from at least August 10, 2025, through McPherson's resignation effective August 29, 2025, and through Mushak's resignation effective September 15, 2025, McPherson and Mushak were engaging in activities conflicting with their obligations to the Company in breach of their fiduciary duties to the Company.

259.    Upon information and belief, during McPherson's period of disloyalty, the Company paid him $12,500 in salary.

260.    Upon information and belief, during Mushak's period of disloyalty, the Company paid him $22,200 in salary.

261.    Further, upon information and belief, McPherson's and Mushak's conduct was intentional, willful, outrageous, and malicious, and justifies the imposition of punitive damages.

### FIFTH CAUSE OF ACTION
**(Tortious Interference with Contractual Relations—Against All Defendants)**
**(For Monetary Damages)**

262.    The Company repeats and realleges each and every allegation contained in the paragraphs above as though set forth herein.

263.    Mushak owes contractual obligations to CFO Squad pursuant to the Mushak Covenant Agreement, which is valid and enforceable.

264.    McPherson owes contractual obligations to CFO Squad pursuant to the McPherson Covenant Agreement, which is valid and enforceable.

265.    Cena owes contractual obligations to CFO Squad pursuant to the Cena Covenant Agreement, which is valid and enforceable.

266.    Each Defendant was aware of the Covenant Agreements.

267. Each Defendant intentionally and unjustifiably interfered with the Covenant Agreements of the other Defendants by inducing Mushak, McPherson, and Cena, respectively, to breach their respective Covenant Agreements with CFO Squad.

268. The Company had a valid, binding contract with NRx Pharmaceuticals.

269. The Company had a valid, binding contract with Client #2.

270. The Company had a valid, binding contract with American Clean.

271. The Company had a valid, binding contract with Dickerson.

272. Defendants knew of NRx Pharmaceuticals' contractual relationship with CFO Squad, but nonetheless, acted in concert to interfere with those contractual relations for the improper purpose of benefiting themselves and LMAM and damaging CFO Squad's business.

273. Defendants knew of Client #2's contractual relationship with CFO Squad, but nonetheless, acted in concert to interfere with those contractual relations for the improper purpose of benefiting themselves and LMAM and damaging CFO Squad's business.

274. Defendants knew of American Clean contractual relationship with CFO Squad, but nonetheless, acted in concert to interfere with those contractual relations for the improper purpose of benefiting themselves and LMAM and damaging CFO Squad's business.

275. Defendants knew of Dickerson's contractual relationship with CFO Squad, but nonetheless, acted in concert to interfere with those contractual relations for the improper purpose of benefiting themselves and LMAM and damaging CFO Squad's business.

276. The Company's contracts with NRx Pharmaceuticals, Client #2, American Clean, and Dickerson contain provisions restricting those clients, respectively, from directly or indirectly, hiring any employee of the Company.

277.    Upon information and belief, Defendants actively and intentionally induced NRx Pharmaceuticals to breach its contract with CFO Squad.

278.    Upon information and belief, Defendants actively and intentionally induced Client #2 to breach its contract with CFO Squad.

279.    Upon information and belief, Defendants actively and intentionally induced American Clean to breach its contract with CFO Squad.

280.    Upon information and belief, Defendants actively and intentionally induced Dickerson to breach its contract with CFO Squad.

281.    As a direct and proximate result of Defendants' intentional and unjustified interference with the Covenant Agreements and the agreements with NRx Pharmaceuticals, Client #2, American Clean, and Dickerson, CFO Squad has suffered direct and consequential damages, and is entitled to recover compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

282.    Further, upon information and belief, Defendants' conduct was intentional, willful, outrageous, and malicious, and justifies the imposition of punitive damages.

## SIXTH CAUSE OF ACTION
### (Tortious Interference with Prospective Economic Advantage—Against All Defendants)
### (For Monetary Damages)

283.    The Company repeats and realleges each and every allegation contained in the paragraphs above as though set forth herein.

284.    The Company has and had protectable business relationships with the CFO Squad employees that resigned and have been hired, or will be hired, by LMAM, which the Company reasonably expected would have continued to benefit the Company.

285.    The Company has and had protectable business relationships with clients, which the Company reasonably expected would have continued to benefit the Company.

286.    At all relevant times, McPherson and Mushak knew of these prospective business relationships, having just resigned from CFO Squad themselves, and upon information and belief used confidential information learned during their employment to further their solicitation efforts of employees and clients.

287.    Upon information and belief, McPherson and Mushak intentionally induced, permitted, and encouraged CFO Squad employees to resign from CFO Squad and to accept employment with LMAM and clients to move their business to LMAM.

288.    McPherson's and Mushak's conduct, upon information and belief, resulted in the severance of the Company's prospective business relationships with the employees who resigned and the clients who have moved their business to LMAM.

289.    McPherson's and Mushak's conduct, upon information and belief, was done purposefully and with malicious, wrongful, and unjustifiable intent, through improper means, and for an improper purpose.

290.    As a direct and proximate result of McPherson's and Mushak's conduct, the Company has suffered and will continue to incur direct and consequential damages, including but not limited to damage to goodwill, the costs of hiring and retaining new employees, and is entitled to recover compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

291.    Further, upon information and belief, Defendants' conduct was intentional, willful, outrageous, and malicious, and justifies the imposition of punitive damages.

## SEVENTH CAUSE OF ACTION
**(Unfair Competition—Against McPherson and Mushak)**
**(Monetary Damages)**

292.    The Company repeats and realleges each and every allegation contained in the paragraphs above as though set forth herein.

293.    McPherson and Mushak competed unfairly with the Company by, upon information and belief, plotting to start a competitor business while employed with CFO Squad, soliciting CFO Squad employees to join their new business, soliciting clients and prospective clients, and exploiting their access to confidential information, which they only knew as a result of their own employment by CFO Squad and membership on the leadership team, all in furtherance of LMAM's business.

294.    McPherson and Mushak's conduct is especially egregious as they were members of CFO Squad's leadership team and had been placed on a special partnership action plan.

295.    Upon information and belief, and as a direct and proximate result of McPherson's and Mushak's conduct, the Company has suffered direct and consequential damages, and is entitled to recover compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION
**(Misappropriation of Confidential Information—Against McPherson and Mushak)**
**(For Injunctive Relief and Monetary Damages)**

296.    Plaintiff repeats and realleges the allegations above as if set forth fully herein.

297.    As Directors of CFO Squad and as members of the leadership team, McPherson and Mushak were privy to highly valuable confidential information regarding all facets of the Company's business including (a) client lead lists; (b) engagement letters which contained, *inter alia*, pricing and staffing structure information; and (c) information about employees, compensation, and incentives.

298.    McPherson and Mushak were given access to confidential information of CFO Squad, including client lead lists, and confidential information of the Company's clients by virtue of their employment with CFO Squad.

299.    Without authorization, McPherson and Mushak took and used confidential and proprietary information of CFO Squad, including client lead lists, and confidential information of the Company's clients for their personal use and for the benefit of themselves, each other, and their new competitive venture LMAM.

300.    For example, upon information and belief, McPherson used information from a confidential client lead list to secure new business for LMAM.  Approximately one month after his resignation from CFO Squad, McPherson began rendering services to Royalty Management, a prospective client of the Company which was on a confidential Company lead list that was shared with McPherson.

301.    Upon information and belief, Mushak has used information from confidential client lead lists to similarly solicit new business for LMAM.

302.    Additionally, McPherson and Mushak have not returned Company-issued computers which, upon information and belief, contain confidential Company information.

303.    As a direct and proximate result of Defendants' misappropriation, CFO Squad has suffered and will continue to suffer irreparable harm in the form of lost profits and lost business opportunities, in addition to monetary damages in an amount to be determined at trial.

304.    Defendants' conduct was malicious and wanton, warranting the award of punitive damages.

## JURY DEMAND

CFO Squad respectfully demands a jury trial pursuant to Fed. R. Civ. P. 38 on all issues so triable.

**WHEREFORE**, Plaintiff The CFO Squad, LLC, respectfully requests that this Court enter judgment in its favor, against the Defendants, as follows:

A. In the form of a Temporary Restraining Order and Order preliminarily and permanently enjoining Defendants from taking any action, directly or indirectly, to:

    a. attempt in any manner to solicit, persuade or induce any individual, person or entity which is, or at any time during your employment with the Company was, a Client [as defined in the agreement] of the Company to terminate, reduce or refrain from renewing or extending its contractual or other relationship with the Company in regard to the purchase of products or services manufactured, marketed or sold by the Company, or to become a Client of or enter into any contractual or other relationship with you or any other individual, person or entity in regard to the purchase of products or services similar or identical to those manufactured, marketed or sold by the Company;

    b. render to or for any Client (whether working as an employee or consultant for such Client or otherwise) any services of the type rendered by the Company;

    c. employ as an employee or retain as a consultant any person who is then, or at any time during the preceding twelve (12) months was, an employee of or exclusive consultant to the Company, or persuade or attempt to persuade any employee of or exclusive consultant to the Company to leave the employ of the Company or to become employed as an employee or retained as a consultant by anyone other than the Company;

    d. use or disclose CFO Squad's confidential information; and further to

    e. return to CFO Squad all Company documents, confidential and client information, and Company-issued computers.

B. Awarding compensatory damages to CFO Squad, in an amount to be determined at trial, including but not limited to the loss of client revenues and decrease in the valuation of the Company.

C. Ordering Mushak and McPherson to disgorge all compensation, including the amount of all salary, bonus, vacation, and benefits paid to them by CFO Squad during their period of disloyalty to CFO Squad, in an amount to be determined at trial;

D. Awarding CFO Squad interest;

E. Awarding CFO Squad punitive damages;

F.  Awarding CFO Squad its costs, expenses, and attorneys' fees incurred in connection

with this action; and

G.  Awarding such other and further relief as the Court deems just and proper.

Dated: October 21, 2025
       New York, New York

**DAVIS+GILBERT LLP**

By:  _/s/ Daniel A. Dingerson_
Daniel A. Dingerson
Danielle C. Zolot
1675 Broadway
New York, New York 10019
Telephone: (212) 237-1488
Facsimile: (212) 468-4888
ddingerson@dglaw.com
dzolot@dglaw.com

_Attorneys for Plaintiff_
_THE CFO SQUAD, LLC_