**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE CFO SQUAD, LLC,

                  Plaintiff,

    -against-

LUKE MCPHERSON, ANDRIY MUSHAK, and
NICOLE CENA,

                  Defendants.

Case No. 7:25-cv-08722

**ORAL ARGUMENT
REQUESTED**

---

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR A TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**

**DAVIS+GILBERT LLP**
Daniel A. Dingerson
Danielle C. Zolot
1675 Broadway
New York, NY  10019
Telephone: (212) 237-1488
Facsimile: (212) 468-4888
ddingerson@dglaw.com
dzolot@dglaw.com

*Attorneys for Plaintiff*
*THE CFO SQUAD, LLC*

# **TABLE OF CONTENTS**

Page

**PRELIMINARY STATEMENT** ...................................................................................1

**STATEMENT OF RELEVANT FACTS**.....................................................................3

    A.  The Parties and their Prior Relationship ..........................................................3

    B.  Defendants Voluntarily Entered into Reasonable Restrictive Covenants with CFO Squad...............................................................................................................5

    C.  Defendants Have Breached their Restrictive Covenants Including by Engaging Clients and Hiring Employees of CFO Squad ..........................................................6

    D.  Impact of Defendants' Breaches on CFO Squad ........................................10

    E.  Defendants' Refused to Provide Assurances of Compliance Prior to Litigation.........11

**APPLICABLE LEGAL STANDARDS** .................................................................11

**ARGUMENT**.........................................................................................................15

   I.  THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ..............................................................15

    A.  Plaintiff is Likely to Succeed on its Breach of Contract Claims .................15

      1.  The Existence of Valid and Enforceable Agreements ...........................16

      2.  CFO Squad Fully Performed Under the Agreements, Defendants Breached Their Restrictive Covenants, and CFO Squad Suffered and Continues to Suffer Harm as a Result of Defendants' Breaches .........................................................20

    B.  Plaintiff Will Suffer Irreparable Injury Absent Injunctive Relief...............22

    C.  The Balancing of the Hardships Tips Decidedly in Favor of Injunctive Relief ..........23

    D.  Granting CFO Squad Injunctive Relief Serves the Public Interest.............25

    E.  There Are Also Sufficiently Serious Questions Going to the Merits To Make Them A Fair Ground for Litigation and the Balance of Hardships Tips Decidedly in Plaintiff's Favor ...................................................................................................25

    F.  Plaintiff Should Not Be Required to Post a Bond......................................27

  II.  THE COURT SHOULD GRANT THE COMPANY'S REQUEST FOR EXPEDITED DISCOVERY IN ADVANCE OF A PRELIMINARY INJUNCTION HEARING.........27

**CONCLUSION** ...................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3M Co. v. Performance Supply, LLC,*
    458 F. Supp. 3d 181 (S.D.N.Y. 2020)......................................................................12

*Adecco USA, Inc. v. Staffworks, Inc.,*
    6:20-CV-744(MAD/TWD), 2020 U.S. Dist. LEXIS 226382 (N.D.N.Y. Sep.
    15, 2020) .......................................................................................................................19

*Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.,*
    94 Civ. 5620 (JFK), 1994 U.S. Dist. LEXIS 18457 (S.D.N.Y. December 28,
    1994) ............................................................................................................................28

*AIM Int'l Trading, L.L.C. v. Valcucine S.p.A.,*
    No. 02 Civ. 1363, 2002 U.S. Dist. LEXIS 10373 (S.D.N.Y. June 11, 2002).........26

*Ayyash v. Bank Al-Madina,*
    233 F.R.D. 325 (S.D.N.Y. 2005) ...............................................................................28

*BDO Seidman v. Hirshberg,*
    93 N.Y.2d 382 (1999) .................................................................................................16

*Benihana, Inc. v. Benihana of Tokyo, LLC,*
    784 F.3d 887 (2d Cir. 2015).........................................................................12, 14, 25

*Broker Genius, Inc. v. Volpone,*
    313 F.Supp. 3d 484 (S.D.N.Y. 2018).........................................................................12

*Cortland Line Holdings LLC v. Lieverst,*
    No. 5:18-cv-307, 2018 U.S. Dist. LEXIS 233394 (N.D.N.Y. Apr. 6, 2018)...........24

*Doctor's Assocs. v. Distajo,*
    107 F.3d 126 (2d Cir. 1997).......................................................................................27

*Digital Sin, Inc. v. Does 1-17,*
    12 Civ. 3873 (JMF), 2012 U.S. Dist. LEXIS 78832 (S.D.N.Y. June 5, 2012).......28

*Empower Energies, Inc. v. Solarblue, LLC,*
    No. 16cv3220 (DLC), (S.D.N.Y. Sep. 23, 2016)......................................................14

*Eng v. Smith,*
    849 F.2d 80 (2d Cir. 1988).........................................................................................12

*Fid. Info. Servs. v. Katz*,
    1:09-CV-766 (LEK/DRH), 2009 U.S. Dist. LEXIS 150674 (N.D.N.Y. Aug. 4,
    2009) .................................................................................................................29

*Five Star Dev. Resort Cmtys., LLC v. iStar RC Paradise Valley LLC*,
    No. 09 Civ. 2085 (LTS), 2010 U.S. Dist. LEXIS 25581 (S.D.N.Y. Mar. 18,
    2010) ...........................................................................................................25, 26

*Forest City Daly Hous., Inc. v. Town of N. Hempstead*,
    175 F.3d 144 (2d Cir. 1999)...............................................................................12

*FTI Consulting, Inc. v. Reg'l Health Properties, Inc.*,
    No. 21-cv-4847, 2022 U.S. Dist. LEXIS 179254 (S.D.N.Y. Sept. 30, 2022) ........................15

*Iannucci v. The Segal Co.*,
    No. 06 Civ. 4720 (PKL), 2006 U.S. Dist. LEXIS 43339 (S.D.N.Y. June 26,
    2006) ................................................................................................. *passim*

*IBM v. De Freitas Lima*,
    No. 7:20-cv-04573 (PMH), 2020 U.S. Dist. LEXIS 161532, (S.D.N.Y. Sep. 3,
    2020) .................................................................................................................27

*IBM v. De Freitas Lima*,
    833 F. App'x 911 (2d Cir. 2021) .........................................................................16

*Intrepid Financial Partners, LLC v. Fernandez*,
    No. 1:20-cv-09779, Doc. 32 (S.D.N.Y. Nov. 30, 2020)......................................27

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004).................................................................18

*JTH Tax, Inc. v. Sawhney*,
    No. 19-cv-4035, 2019 U.S. Dist. LEXIS 116330 (S.D.N.Y. July 11, 2019)..............14, 24, 25

*Kelley-Hilton v. Sterling Infosystems Inc.*,
    426 F. Supp. 3d 49 (S.D.N.Y. 2019)...................................................................17

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    14-MD-2542, 2014 U.S. Dist. LEXIS 206287 (S.D.N.Y. July 23, 2014) ...........27

*Lagrange v. Knoedler Gallery*,
    11 Civ. 8757 (PGG), 2011 U.S. Dist. LEXIS 163035 (S.D.N.Y. Dec. 23,
    2011) .................................................................................................................27

*Malibu Media, LLC v. Doe*,
    No. 15 Civ. 3137 (LGS), 2015 U.S. Dist. LEXIS 193729 (S.D.N.Y. May 28,
    2015) .................................................................................................................27

*Marsh USA Inc. v Karasaki*,
    08 Civ. 4195 (JGK), 2008 U.S. Dist. LEXIS 90986 (S.D.N.Y. Oct. 30, 2008) ............. *passim*

*Marsh USA LLC v Parrish*,
    25 Civ. 6208 (GBD), 2025 U.S. Dist. LEXIS 183989 (S.D.N.Y. Sep. 18,
    2025) ................................................................................................................13, 14, 25

*Mastercard Int'l Inc. v. Nike, Inc.*,
    164 F. Supp. 3d 592 (S.D.N.Y. 2016)..............................................................16, 18

*Mercer Health & Benefits LLC v. DiGregorio*,
    307 F. Supp. 3d 326 (S.D.N.Y. 2018)................................................13, 16, 17, 18

*Mercer Health & Benefits LLV v. Brown, et al.*,
    No. 1:22-cv-03844, Doc. 50 (S.D.N.Y. May 25, 2022)..........................................27

*Ministers & Missionaries Benefit Bd. v. Snow*,
    26 N.Y.3d 466, 474 (2015) ...................................................................................15

*Mohegan Lake Motors, Inc. v. Maoli*,
    559 F. Supp. 3d 323 (S.D.N.Y. 2021)....................................................................15

*Natsource LLC v. Paribello*,
    151 F. Supp. 2d 465 (S.D.N.Y. 2001)....................................................................23

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
    992 F.2d 430 (2d Cir. 1993)...................................................................................26

*New York v. Griepp*,
    17-CV-3706 (CBA) (JO), 2017 U.S. Dist. LEXIS 113505 (E.D.N.Y. July 20,
    2017) .....................................................................................................................28

*Notaro v. Koch*,
    95 F.R.D. 403 (S.D.N.Y. 1982) .............................................................................28

*QBE Ams., Inc. v. Allen*,
    No. 22-cv-756 (JSR), 2022 U.S. Dist. LEXIS 54398 (S.D.N.Y. Mar. 24, 2022)....................12

*Renaissance Nutrition, Inc. v. Kurtz*,
    No. 08 CV 800S, 2012 U.S. Dist. LEXIS 2490 (W.D.N.Y. Jan. 7, 2012) ..............17

*Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999)...................................................................................12

*Russell Reynolds Assocs., Inc. v. Usina*,
    23 Civ. 2369 (JHR), 2023 U.S. Dist. LEXIS 79149 (S.D.N.Y. 2023) ....................28

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010)......................................................................................12

*Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*,
    468 F. App'x 43 (2d Cir. 2012) ............................................................................19

*Solomon Agency Corp. v. Choi*,
    No. 16-CV-0353 (LDH)(RML), 2016 U.S. Dist. LEXIS 75949 (E.D.N.Y.
    May 16, 2016)......................................................................................................17

*Syntel Sterling Best Shares Mauritus Ltd. v. TriZetto Group, Inc.*,
    15 Civ. 211 (LGS), 2021 U.S. Dist. LEXIS 75875 (S.D.N.Y. Apr. 20, 2021).......................25

*Testing Servs., N.A. v. Pennisi*,
    443 F. Supp. 3d 303 (E.D.N.Y. 2020) ..................................................................13

*Ticor Title Ins. Co. v. Cohen*,
    173 F.3d 63 (2d Cir. 1999)...............................................................................13, 23

*Travellers Int'l AG v. Trans World Airlines*,
    684 F. Supp. 1206 (S.D.N.Y. 1988).....................................................................26

*Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*,
    73 F. Supp. 3d 209 (S.D.N.Y. 2014)....................................................................17

*USI Ins. Servs. LLC v. Miner*,
    801 F. Supp. 2d 175 (S.D.N.Y. 2011)..................................................................16

*Verizon Communications, Inc, v. Pizzirani*,
    462 F. Supp. 2d 648 (E.D.P.A. 2006) ..............................................................15, 25

*Willis Re Inc. v. Herriott*,
    550 F. Supp. 3d 68 (S.D.N.Y. 2021).......................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 65 ......................................................................................1, 11, 27, 29

Plaintiff The CFO Squad, LLC ("CFO Squad", the "Company", or "Plaintiff"), respectfully submits this Memorandum of Law in support of its Motion, by way of an Order to Show Cause, for a Temporary Restraining Order and Preliminary Injunction pursuant to Fed. R. Civ. P. 65 against Defendants Luke McPherson, Andriy Mushak, and Nicole Cena (collectively, "Defendants") and for an order providing for expedited discovery.

## PRELIMINARY STATEMENT

CFO Squad—a family-owned financial and business advisory firm that provides outsourced chief financial officer and other consulting services—and its Founder and Managing Director, Joseph Himy, entrusted McPherson and Mushak with the metaphorical keys to the kingdom. Himy hired them both to senior-level positions and gave them increasing responsibilities and trust as their careers at CFO Squad progressed. By mid-2025, CFO Squad had welcomed McPherson and Mushak onto the Company's exclusive leadership team (along with Himy and one other employee) and had put in place action plans for each to become an equity partner in the Company. Only after doing so did it become apparent to CFO Squad and Himy that the trust and responsibility given to McPherson and Mushak had been sorely misplaced.

In fact, around the same time that McPherson and Mushak were regularly meeting with a consultant regarding partnership at CFO Squad, they were secretly plotting to resign and form a competing entity, LMAM Consulting Group LLC ("LMAM"). Not only were McPherson and Mushak plotting to compete with CFO Squad, they did so by enacting a scheme to hire away key employees (including Cena) and misappropriate CFO Squad's client relationships, particularly those that McPherson and Mushak had serviced for the Company. McPherson and Mushak have also targeted at least one of CFO Squad's prospective clients, a lead that came in just before McPherson resigned.

1

In pursuing their deceitful and brazen scheme to take CFO Squad's clients, McPherson and Mushak are trading on the years of training and resources that CFO Squad invested in them and the valuable client relationships and good will with which the Company entrusted them. They are furthering that scheme by hiring away CFO Squad's client-facing employees to further lure clients away from the Company.

CFO Squad and Himy trusted McPherson and Mushak, at least in part, because each of them had executed a protective covenant agreement that prohibited them, *inter alia*, from doing exactly what they are now doing: soliciting or servicing CFO Squad's clients and client leads with whom they were involved on the Company's behalf, and soliciting or hiring away CFO Squad's employees. CFO Squad now seeks to stem the on-going harm to the Company and put a halt to Defendants' ongoing violations of their restrictive covenants and breaches of their confidentiality agreements through injunctive relief.

As discussed in more detail below, a temporary restraining order, and ultimately a preliminary injunction, is appropriate because CFO Squad is being irreparably harmed and will ultimately succeed on the merits of its contract claims. The restrictive covenants at issue are narrowly drawn and designed to protect CFO Squad's legitimate business interests, and they do not interfere with the Defendants' ability to work in the industry, operate a competitive business, or earn a living. The covenants are especially reasonable when considering the senior positions Defendants occupied at CFO Squad. Moreover, CFO Squad has already been irreparably harmed by Defendants' misappropriation of Company clients, prospective clients, and employees, and will further be harmed if Defendants are not immediately enjoined from continuing to violate their contractual obligations. An injunction would protect CFO Squad's legitimate interests without unduly harming Defendants who remain free to operate LMAM—even in direct competition with

the Company—provided they do not attempt to trade on the Company's client relationships and good will.  Nor will an injunction negatively impact the public interest in any meaningful way.

Accordingly, the Court should enter a temporary restraining order and preliminary injunction to allow CFO Squad to protect its business, its legitimate interests in its client and employee relationships, associated good will, and confidential information.  The Court should also order expedited discovery in advance of an evidentiary hearing.

## STATEMENT OF RELEVANT FACTS

### A.    The Parties and their Prior Relationship

CFO Squad is a financial and business advisory firm that provides outsourced chief financial officer advisory, outsourced accounting, and technical accounting consulting services for emerging to mid-sized public and private companies, including audit preparation, financial reporting, technical accounting, bookkeeping, financial modeling, oversight of accounting staff via its CFO advisor or controller, and due diligence services and relies on a team of experienced CFOs, financial reporting specialists, and accountants to meet its clients' needs.  Declaration of Joseph Himy, dated October 21, 2025 ("Himy Decl.") ¶¶5, 7.  Though offering a broad array of services, CFO Squad is a small, family-owned company that Himy has steadily built since its founding in 2013.  *Id.* ¶6.

CFO Squad hired McPherson as a Senior Manager and subsequently promoted him to Director, followed by an elevation to CFO Squad's leadership team.  *Id.* ¶11.  In those roles, McPherson oversaw the Company's SEC Reporting department, performed related services for clients including American Clean Resources Group, Inc., ("American Clean") and Dickerson Infrastructure Inc. ("Dickerson"), had supervisory responsibility over other employees, and

assisted with business development initiatives and creating proposals for new client leads.  *Id.*
McPherson was highly compensated.

CFO Squad hired Mushak as a Director to lead the Company's Boston office.  *Id.* ¶15.
Like McPherson, Mushak was also elevated to CFO Squad's leadership team.  *Id.*  In those roles,
Mushak oversaw the Company's SEC Reporting department with McPherson, performed related
services for clients including NRx Pharmaceuticals, Inc. ("NRx Pharmaceuticals"), had
supervisory responsibility over other employees, and assisted with business development
initiatives and creating proposals for new client leads.  *Id.*  CFO Squad hired Mushak for his sales
skills and his employment agreement included a bonus plan tied to sales objectives which
compensated him based on a percentage of revenues from "Introduced Clients", as defined therein.
*Id.* ¶17, 38.  CFO Squad gave Mushak an open checkbook to aid in his business development and
encouraged him to develop current clients and attract prospective clients.  *Id.* ¶18.  CFO Squad
also agreed to pay Mushak a $25,000 first-year bonus in upfront installments as draw against
earned bonus payments.  *Id.* ¶17.  Mushak was highly compensated.

Following their elevations, McPherson and Mushak were two of only four members of
CFO Squad's leadership team.  *Id.* ¶21.  As such, they had insight into nearly every facet of the
Company's operations and were privy to highly valuable confidential information, including the
Company's list of prospective clients, strategic initiatives, marketing and sales ideas, Himy's
network of contacts, and many client engagement letters and proposals which include confidential
information such as a full description of needs and services being offered along with CFO Squad
employee rates.  *Id.* ¶¶22-25, 129-131.

Defendant Cena worked for CFO Squad as an accountant, before being promoted to Senior
Account.  As of her resignation on October 7, 2025, Cena was on a path to another promotion to

Supervisor at year end. *Id.* ¶¶29-30. Cena's duties included technical accounting services for clients, including NRx Pharmaceuticals. *Id.* ¶30. Cena was directly client-facing, regularly meeting with client executives, and had developed close relationships with the clients she serviced along with an extensive understanding of their business, financial information, and needs. *Id.* ¶31. CFO Squad invested significant time and resources training Cena and paid a placement fee of 20% of her yearly salary when it hired her, totaling approximately $21,000. *Id.* ¶32.

**B.    Defendants Voluntarily Entered into Reasonable Restrictive Covenants with CFO Squad**

In connection with Defendants' hiring and continued employment by CFO Squad, each of the Defendants executed a "Protective Covenant and Inventions Assignment Agreement" that contained restrictive covenants barring the solicitation or hiring of Company employees and the solicitation or provision of services to CFO Squad clients other than on the Company's behalf both during their employment and for 24 months thereafter, and prohibiting their use of confidential information received in their roles at the Company in perpetuity (collectively, the "Restrictive Covenants"). *Id.* ¶¶36, 40, 42 & Exs. B, D, F ¶3. Notably, "Client", for purposes of the Restrictive Covenants, is narrowly defined as any client of CFO Squad as of the time of an employee's termination of employment or in the twelve months preceding such date, but only if the employee "had a direct relationship with, supervisory responsibility for or otherwise [was] involved with such client during [his/her] employment with the Company". Himy Decl. Exs. B, D, F ¶3(b).

Defendants also agreed to "keep confidential and not disclose the Confidential Information [as defined in the Covenant Agreements] to anyone or use it for [their] own benefit or for the benefit of others, except in rendering services as an employee of the Company." Himy Decl. Exs. B, D, F ¶1(a).

The Restrictive Covenants were designed to protect the Company by preventing employees, such as Defendants, from soliciting and servicing the very clients with which they were involved with while employed by CFO Squad and to protect the investment that CFO Squad made to acquire new clients, to learn its clients' businesses, financial information, and to recruit, hire, and train employees. Himy Decl. ¶¶46-47. They were also designed to protect client-specific knowledge gained through servicing the Company's clients. *Id.* ¶47.

In their respective agreement, Defendants each acknowledged that monetary remedies at law for a breach would be inadequate and that the Company would be entitled to equitable relief in the form of specific performance and injunctive relief. Himy Decl. Exs B, D, F ¶4.

McPherson executed his Protective Covenant and Inventions Assignment Agreement on July 8, 2022 (the "McPherson Covenant Agreement", annexed to the Himy Decl. as **Exhibit B**). Himy Decl. ¶36. Mushak executed his Protective Covenant and Inventions Assignment Agreement on July 6, 2023 (the "Mushak Covenant Agreement", annexed to the Himy Decl. **Exhibit D**). *Id.* ¶40. Cena executed her Protective Covenant and Inventions Assignment Agreement on April 12, 2023 (the "Cena Covenant Agreement", annexed to the Himy Decl. as **Exhibit F**, and collectively with the McPherson Covenant Agreement and Mushak Covenant Agreement, the "Covenant Agreements"). *Id.* ¶42.

### C.    Defendants Have Breached their Restrictive Covenants Including by Engaging Clients and Hiring Employees of CFO Squad

McPherson resigned on August 4, 2025, and McPherson and CFO Squad agreed to end his employment effective August 29, 2025. *Id.* ¶10. Mushak resigned on August 8, 2025, and CFO Squad and Mushak agreed to expedite Mushak's end date to September 15, 2025. *Id.* ¶14.

Prior to their resignations, as CFO Squad later discovered, McPherson and Mushak conspired to launch a new competitive financial and regulatory consulting firm LMAM Consulting

Group LLC ("LMAM"). Declaration of David Fisher, dated October 21, 2025 ("Fisher Decl."), at ¶13 & Ex. E; Himy Decl. ¶¶53-54. LMAM operates, like CFO Squad, through a network of financial professionals in conjunction with in-house accountants. Himy Decl. ¶55.

To quickly build their new business, McPherson and Mushak hired Cena, another senior-level CFO Squad employee. *Id*. ¶56. Moreover, at least one other employee, Logan Schmitz, who worked predominantly with McPherson at CFO Squad, has also recently resigned and is believed to be joining LMAM. *Id.* ¶59. Further, CFO Squad believes that McPherson and Mushak have contacted other CFO Squad employees about their employment. *Id*. ¶61. McPherson, Mushak, and Schmitz have all retained their Company-issued computers which likely contain confidential CFO Squad information and documents. *Id.* ¶133.

Even more damaging than the poaching of employees has been Defendants' targeted attack on CFO Squad's client base. As of the filing of the Complaint, at least four clients and one prospective client have engaged LMAM for services identical or similar to those CFO Squad previously provided. *See id.* ¶63.

For example, on or about October 2, 2025, NRx Pharmaceuticals terminated its contractual relationship with CFO Squad, expressly citing its intention to continue working with Mushak who had a direct relationship with and supervisory responsibility for NRx Pharmaceuticals during his employment with CFO Squad. Cena also had a direct relationship with NRx Pharmaceuticals during her employment with CFO Squad and devoted a significant amount of her hours to servicing NRx Pharmaceuticals in 2025. *Id.* ¶¶66-67, 70-71.

Prior to the abrupt end, CFO Squad made a significant investment in developing its relationship with NRx Pharmaceuticals including by hiring three experienced director-level individuals with specialized knowledge—and paying placement fees totaling approximately

$85,000 to do so—and declining to prioritize pursuing other potential new client relationships. *Id.* ¶¶76-80. CFO Squad had been providing services to NRx Pharmaceuticals of approximately $35,000-$50,000 per month, all of which revenue the Company has now lost; CFO Squad has also lost future anticipated revenues in 2025 totaling approximately $150,000-$200,000 as well as all revenues in 2026 and going forward, which the Company reasonably expected to increase. *Id.* ¶¶82-85. At the same time, the employees CFO Squad hired to service NRx Pharmaceuticals now have excess capacity. *Id.* ¶86. Meanwhile, LMAM was avoided the costs of investing in building a relationship with NRx Pharmaceuticals, including that required to hire and train employees. *Id.* ¶87.

At LMAM, Mushak has also been working with another client (referred to herein as "Client #2" for confidentiality reasons) with whom Mushak had a direct relationship and supervisory responsibility for during his employment with CFO Squad. *Id.* ¶¶88-90. On September 24, 2025—days after Mushak's employment with CFO Squad ended—he used his LMAM email address to email the CEO of Client #2 with an "engagement letter" for a "consulting arrangement". *Id.* ¶91. In that email, Mushak wrote that he was "very much looking forward to continuing our work together with you, [], and the [Client #2] team once again." Complaint ¶100. Since Client #2 began working with CFO Squad in October 2023, CFO Squad has invoiced Client #2 for $768,323.37 for services provided. In 2025 alone, Client #2 was responsible for $479,953.02 of CFO Squad revenues. *Id.* ¶92. As a result of Mushak and the other Defendants' efforts, CFO Squad is at risk of losing Client #2's business. *Id.* ¶93.

A third CFO Squad client, American Clean, has also started working with McPherson through LMAM. *Id.* ¶¶94-95. McPherson had a direct relationship with and supervisory responsibility for the American Clean relationship during his employment with CFO Squad.

*Id.* ¶96.  CFO Squad previously performed services for American Clean in the areas of pre-audit and financial reporting, technical accounting, and tax preparation and compliance, but since McPherson's departure, American Clean is now using CFO Squad only for tax preparation services and has removed CFO Squad's access to American Clean's QuickBooks account.  *Id.* ¶¶97-99. On or about September 5, 2025, American Clean's CEO informed Himy of its intent to have McPherson continue rendering services to American Clean.  *Id.* ¶¶102.  Since American Clean began working with CFO Squad, CFO Squad has invoiced American Clean for $140,475 for services provided, including $10,000 per month for financial reporting services.  *Id.* ¶105.  As a result of McPherson's and the other Defendants' efforts, American Clean has reduced its use of CFO Squad resulting in a loss of $10,000 per month in anticipated revenues for the remainder of 2025, and over $60,000 in revenues in 2026 and going forward.  *Id.* ¶106.

Since McPherson's departure in August 2025, another client, Dickerson, has begun working with LMAM instead of CFO Squad.  *Id.* ¶¶107-110.  McPherson had a direct relationship with and supervisory responsibility for the Dickerson relationship during his employment with CFO Squad.  *Id.* ¶112.  CFO Squad is aware McPherson is rendering services to Dickerson because, on October 1, 2025, Dickerson's CEO inadvertently copied McPherson at his old CFO Squad email address on an email regarding an upcoming accounting meeting and again on October 8, 2025, and October 10, 2025, in communications regarding financial agreements and projections—services that McPherson provided to Dickerson on behalf of CFO Squad.  *Id.* ¶¶113-114 & Ex. H.  Dickerson has apparently ceased using CFO Squad, resulting in a loss of $2,000-$5,000 per month in anticipated revenues for the remainder of 2025, and all revenues in 2026 and going forward.  *Id.* ¶116.

In addition to clients of the Company, McPherson and Mushak are servicing CFO Squad's prospective clients in violation of the Covenant Agreements, including Royalty Management Holding Corporation ("Royalty").  *See id.* ¶¶118-120 & Exs. B, D, F ¶¶2, 3(b).  CFO Squad is aware that McPherson usurped CFO Squad's business opportunity because on September 11, 2025, the CEO of Royalty inadvertently emailed McPherson at his CFO Squad email address thanking McPherson for help on a financial form.  *Id.* ¶121 & Ex. I.  CFO Squad may have generated approximately $10,000-$20,000 in monthly revenues from Royalty had CFO Squad been engaged.  *Id.* ¶121.

CFO Squad has reason to believe that McPherson and/or Mushak have contacted other CFO Squad clients and client leads as well.  *Id.* ¶¶117, 125.

Defendants are also using CFO Squad's confidential information for their benefit and for the benefit of LMAM in connection with their campaign to misappropriate CFO Squad clients and employees, including information from CFO Squad's client contracts such as staffing rates and client service needs, as well as names of prospective clients from Company lead lists.  By using CFO Squad's confidential information, LMAM has bypassed the need to dedicate significant time, money, and resources in building client relationships and training employees, as CFO Squad has done.  *Id.* ¶¶25, 87, 130.

### D.     Impact of Defendants' Breaches on CFO Squad

Defendants' poaching of CFO Squad employees and clients has had a significant and negative impact on the Company.  *Id.* ¶134.  Putting aside the tremendous impact on employee morale caused by the departure of half of the senior leadership team and their open poaching of significant clients, CFO Squad has been forced to mobilize its remaining resources to protect and continue servicing existing client relationships.  *Id.* ¶¶136-138.  To do so, CFO Squad has been

forced to incur staffing fees to replace the departing employees and has had little time to continue developing new client leads. *Id*. ¶¶139-140. In total, CFO Squad has lost more than $1,000,000 in annual revenues, resulting in a decreased valuation of approximately $2,000,000. *Id*. ¶141.

### E.     Defendants' Refused to Provide Assurances of Compliance Prior to Litigation

On October 3, 2025, while Defendants' attack on CFO Squad's business was underway, CFO Squad wrote to McPherson and Mushak to confirm that they intended to abide by their contractual obligations to CFO Squad. Fisher Decl. ¶¶6-7 & Exs. A-B. Counsel for McPherson and Mushak responded one week later stating she would need to time investigate CFO Squad's claims, and ignored a request on October 9, 2025 for "reasonable assurances from [Defendants] during the interim period" given that Defendants' conduct was ongoing. *Id.* ¶¶7-8.

Likewise, on October 10, after learning that Cena joined LMAM and was rendering services to NRx Pharmaceuticals, CFO Squad wrote to Cena to remind her of her contractual obligations. *Id.* ¶10. Five days later, Cena's counsel—the same attorneys representing McPherson and Mushak—responded with a similar email stating she, "anticipate[d] being able to provide . . . a response by next week." *Id.* ¶11.

Late on Sunday, October 19, Defendants' counsel responded on behalf of McPherson and Mushak asserting that the Restrictive Covenants were not enforceable and thus not agreeing that any of the Defendants would abide by them as to any CFO Squad clients or employees. *Id.* ¶12.

## <u>APPLICABLE LEGAL STANDARDS</u>

Pursuant to Federal Rule of Civil Procedure 65(b), a party may seek a temporary restraining order if faced with immediate and irreparable injury. *See* Fed. R. Civ. P. 65(b); *Iannucci v. The Segal Co.*, No. 06 Civ. 4720 (PKL), 2006 U.S. Dist. LEXIS 43339, *8-9 (S.D.N.Y. June 26, 2006).

The standards for granting a temporary restraining order and a preliminary injunction are the same. *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 191 (S.D.N.Y. 2020).

In the Second Circuit, a party seeking a preliminary injunction must establish: (1) "a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) a likelihood of "irreparable injury in the absence of an injunction"; (3) that "the balance of hardships tips in the plaintiff's favor"; and (4) that the "public interest would not be disserved" by an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).

In order to make a showing of likelihood of success on the merits, a movant "need not show that success is an absolute certainty [but] only make a showing that the probability of prevailing is better than fifty percent." *Broker Genius, Inc. v. Volpone*, 313 F.Supp. 3d 484, 497 (S.D.N.Y. 2018) (citing *Eng v. Smith*, 849 F.2d 80, 92 (2d Cir. 1988)). In fact, "[t]here may remain considerable room for doubt." *Eng*, 849 F.2d at 82. In assessing likelihood of success on the merits, courts should be cognizant of the difficulty of predicting the merits of a claim at an early stage, such as a preliminary injunction hearing. *See Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (applying such guidance in the context of a copyright claim). Moreover, a plaintiff "need only demonstrate likelihood of success on one claim against each defendant." *QBE Ams., Inc. v. Allen*, No. 22-cv-756 (JSR), 2022 U.S. Dist. LEXIS 54398, at *19 (S.D.N.Y. Mar. 24, 2022).

As to irreparable injury, it is the "single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (citation omitted). An irreparable injury is one "that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Forest City Daly*

*Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) (internal quotation marks omitted).

Courts in the Second Circuit have found violations of restrictive covenants that protect client relationships constitute irreparable injury, recognizing that "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *see also, e.g.*, *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 106 (S.D.N.Y. 2021) (finding irreparable injury where "loss of clients relationships and customer goodwill" would be "very difficult, if not impossible, to calculate") (citing *Marsh USA Inc. v Karasaki*, 08 Civ. 4195 (JGK), 2008 U.S. Dist. LEXIS 90986, at *40 (S.D.N.Y. Oct. 30, 2008).); *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 347 (S.D.N.Y. 2018) (finding "loss of client relationships and customer goodwill" sufficient to establish irreparable injury); *Iannucci*, 2006 U.S. Dist. LEXIS 43339, at *10 ("A former employee's breach of a restrictive covenant that results in the employer's loss of a longstanding client is the type of injury suited for equitable relief.").  Similarly, it is well-settled that irreparable injury is found where "there is a substantial risk that the Defendant will use and/or disclose Plaintiff's confidential information." *Marsh USA LLC v Parrish*, 25 Civ. 6208 (GBD), 2025 U.S. Dist. LEXIS 183989, at *9 (S.D.N.Y. Sep. 18, 2025).  Moreover, courts in this Circuit routinely find that, while not dispositive, an employee's acknowledgement in an employment agreement that a violation of restrictive covenants entitles an employer to injunctive relief further supports a finding of irreparable harm.  *See, e.g.*, *Testing Servs., N.A. v. Pennisi*, 443 F. Supp. 3d 303, 332 (E.D.N.Y. 2020) (collecting cases); *Iannucci*, 2006 U.S. Dist. LEXIS 43339, at *11 (finding that a movant's demonstration of irreparable injury is "strengthened significantly" where the employee has

acknowledged, likely in an employment agreement, that the employer is entitled to injunctive relief); *Willis*, 550 F. Supp. 3d at 106 ("one factor that must be considered in deciding whether irreparable harm would result if an injunction did not issue" is contractual language acknowledging entitlement to injunctive relief).

As to balancing of hardships, courts in this District have held that mere solicitation of a party's clients establishes that the balance tips to the party seeking to enforce restrictive covenants, particularly where a defendant freely agreed to such restrictions. *See, e.g.*, *Iannucci*, 2006 U.S. Dist. LEXIS 43339, at \*22 (defendant's imminent solicitation of work from plaintiff's clients supported by evidence of such solicitation establish "a hardship to defendant that is of a greater severity than that imposed on plaintiff"); *JTH Tax, Inc. v. Sawhney*, No. 19-cv-4035, 2019 U.S. Dist. LEXIS 116330, at \*21 (S.D.N.Y. July 11, 2019) (balance favored plaintiff where injunction enforced obligations to which defendant "freely agreed and in exchange for which [d]efendant received the benefits of the franchise arrangement").

Finally, it is well-recognized that the public has an interest in enforcing valid agreements, including those containing including restrictive covenants. *See, e.g.*, *Benihana, Inc.*, 784 F.3d at 897 ("the public interest here is served by the enforcement of the parties' lawful agreement"); *Empower Energies, Inc. v. Solarblue, LLC*, No. 16cv3220 (DLC), at \*37 (S.D.N.Y. Sep. 23, 2016) (finding public interest in enforcing contracts served by injunction). In particular, New York public policy supports enforcement of reasonable restrictive covenants. *See Parrish*, 2025 U.S. Dist. LEXIS 183989, at \*10 ("[T]here is "undoubtedly a public interest in enforcing valid contracts including such restrictive covenants as they may contain."); *JTH Tax, Inc.*, 2019 U.S. Dist. LEXIS 116330, at \*22 ("[I]njunctive relief would serve the public interest by ensuring that reasonable restrictive covenants into which the parties voluntarily entered are enforced and protecting

Plaintiffs' legitimate interests in maintaining the value of their business relationships."). Finally, "[restrictive covenants] serve an important public-policy function by encouraging employers to make significant investments in training key employees and permitting employers to share confidential information with employees, which encourages the free exchange of ideas among top personnel." *Verizon Communications, Inc, v. Pizzirani*, 462 F. Supp. 2d 648, 662 (E.D.P.A. 2006) (applying New York law).

## ARGUMENT

### I.    THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The issuance of a temporary restraining order is necessary to halt Defendants' actions in disregard of their Covenant Agreements and CFO Squad readily satisfies each of the requirements for entry of a temporary restraining order.

#### A.    Plaintiff is Likely to Succeed on its Breach of Contract Claims

CFO Squad will establish all of the elements of its breach of contract claims against Defendants. Under New York law[1], a breach of contract claim requires establishing that: "(1) a valid contract existed between the parties; (2) the adversary breached the contract; (3) the party performed its obligations under the contract; and (4) the party was damaged as a result of the breach." *Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp. 3d 323, 345 (S.D.N.Y. 2021).

---

[1] The Agreements contain a New York choice of law provision. *See* Himy Decl. Exs. B, D, F ¶13. New York courts need not "engage in any conflicts analysis where the parties include a choice-of-law provision in their contract." *FTI Consulting, Inc. v. Reg'l Health Properties, Inc.*, No. 21-cv-4847, 2022 U.S. Dist. LEXIS 179254, at *13 (S.D.N.Y. Sept. 30, 2022) (quoting *Ministers & Missionaries Benefit Bd. v. Snow*, 26 N.Y.3d 466, 474 (2015)). Thus, New York law applies.

1.    The Existence of Valid and Enforceable Agreements

CFO Squad and Defendants plainly entered the Covenant Agreements and they were never amended or terminated by the parties; thus, CFO Squad can establish the existence of a contract with each of the Defendants.

Further, those contracts are valid because the Restrictive Covenants are enforceable under New York law.  New York has adopted the prevailing standard of "reasonableness" in analyzing the validity of restrictive covenants.  *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389 (1999).  "A restrictive covenant between an employer and employee 'will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee.'"  *Int'l Bus. Machs. Corp. v. de Freitas Lima*, 833 F. App'x 911, 912 (2d Cir. 2021) (summary order).

As to time, New York courts have routinely upheld as reasonable two-year non-solicitation provisions.  *Mastercard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 601 (S.D.N.Y. 2016) (collecting cases); *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 189 (S.D.N.Y. 2011). Likewise, New York courts routinely find perpetual confidentiality provisions reasonable in time. *See DiGregorio*, 307 F. Supp. 3d at 351.  New York state courts have upheld "client-based restrictions without geographic limitation as reasonable in scope."  *Karasaki*, 2008 U.S. Dist. LEXIS 90986, at *48.

"Under New York law, an employer 'has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment.'" *USI Ins. Servs. LLC*, 801 F. Supp. 2d at 188.  New York courts routinely find that non-solicitation restrictions aimed at protecting customer relationships are necessary to protect legitimate interests, even where

16

the client relationships were developed by the employee if done at an employer's expense. *See Willis*, 550 F. Supp. 3d at 103; *Kelley-Hilton v. Sterling Infosystems Inc.*, 426 F. Supp. 3d 49, 57 (S.D.N.Y. 2019) (same); *Karasaki*, 2008 U.S. Dist. LEXIS 90986, at *50 (stating that an employer has a legitimate interest "in the protection of client relationships acquired during the course of employment and which the employer has invested its resources—through the employee—to cultivate"). Additionally, an employer has a legitimate interest in protecting against "former employees resigning and encouraging their co-workers to join them in a competitive business." *Renaissance Nutrition, Inc. v. Kurtz*, No. 08 CV 800S, 2012 U.S. Dist. LEXIS 2490, at *14 (W.D.N.Y. Jan. 7, 2012) (citations omitted). New York courts further recognize that confidentiality agreements protect a "broader legitimate interest than" non-solicitation agreements. *See DiGregorio*, 307 F. Supp. 3d at 351. "Restrictions on the use of . . . confidential information in the solicitation of prospective clients can be justified based on the need to protect that information." *Id.*

A restrictive covenant is not harmful to the general public but rather advances the public interest by "tend[ing] to encourage parties to abide by their agreements." *Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014). Further, "[t]he inability of a client to work with its [service provider] of choice is not the sort of harm sufficiently 'injurious to the public' to defeat the enforcement of a restrictive covenant." *See Solomon Agency Corp. v. Choi*, No. 16-CV-0353 (LDH)(RML), 2016 U.S. Dist. LEXIS 75949, at *22 (E.D.N.Y. May 16, 2016).

Lastly, a restrictive covenant is not unreasonably burdensome to an employee where it does not deprive the employee of their livelihood but merely "prohibits him from soliciting his former

employer's clients for a reasonably defined period of time." *Willis*, 550 F. Supp. 3d at 104; *see also Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 540 (S.D.N.Y. 2004).

The Agreements satisfy each factor. First, the Restrictive Covenants are reasonable in time and scope. *See Mastercard*, 164 F. Supp. 3d at 601; *Karasaki*, 2008 U.S. Dist. LEXIS 90986, at *48. Not only are two-year restrictive covenants generally deemed reasonable under New York law, here the Defendants violated the Restrictive Covenants mere weeks after (if not within days or even *before*) submitting their resignations. Further, because the client-focused Restrictive Covenants are limited to CFO Squad's clients—and, in particular, the specific clients with whom Defendants were involved—they are reasonable in scope without consideration of geography.

Next, the Restrictive Covenants are necessary to safeguard the Company's legitimate interests in protecting client relationships and associated good will as the Restrictive Covenants do not broadly preclude any competition by the Defendants but merely restrict them from soliciting and servicing those clients which a Defendant was involved with while employed by CFO Squad. *See Karasaki*, 2008 U.S. Dist. LEXIS 90986, at *50 (enforcing client non-solicitation agreement where employee did not "develop[] those relationships independently of any efforts or expenditures made by [the employer]" but rather did so with support of other employees all "in the course of his employment, for which [employer] paid him a salary and discretionary bonuses"). Indeed, Defendants agreed that the Restrictive Covenants were "necessary for the protection of goodwill and business of the Company." Himy Decl. Exs. B, D, F ¶3(a). The Restrictive Covenants are also necessary to safeguard the Company's legitimate interests in preserving the value of investment and training in employees and in "prevent[ing] the use of covered information" in connection with Defendants' new business venture. *See DiGregorio*, 307 F. Supp. 3d at 351.

Moreover, the Restrictive Covenants are not harmful to the general public, but rather advance the public's interest in encouraging Defendants to abide by their contractual obligations. *See Karasaki*, 2008 U.S. Dist. LEXIS 90986, at *66 (granting injunction where defendant had been "in flagrant breach of the [restrictive covenants] since his resignation").

Finally, the restrictions in question are not unreasonably burdensome to the Defendants because they do not prohibit the Defendants from working in the industry generally or even for a direct competitor. As explained above, the Restrictive Covenants were narrowly tailored to safeguard CFO Squad from its departing employees poaching clients with whom the employee was involved while employed by CFO Squad and from taking employees or using confidential information. In this regard, the Restrictive Covenants do not prevent Defendants from soliciting or servicing clients other than CFO Squad clients. *See Adecco USA, Inc. v. Staffworks, Inc.*, 6:20-CV-744(MAD/TWD), 2020 U.S. Dist. LEXIS 226382, at *33 (N.D.N.Y. Sep. 15, 2020) (where non-solicitation clause did not prevent defendants from soliciting organizations that were never plaintiff's clients, "[e]nforcement of the non-solicitation clauses protects the needs of the employer without resulting in a loss of livelihood for Defendants"); *Karasaki*, 2008 U.S. Dist. LEXIS 90986, at *50.

Lastly, Defendants agreed that the Restrictive Covenants were "reasonable and necessary for the protection of goodwill and business of the Company", which further supports that they are necessary to protect CFO Squad's legitimate interests. Himy Decl. Exs. B, D, F ¶3(a); *see also Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*, 468 F. App'x 43, 46 (2d Cir. 2012) (affirming grant of preliminary injunction and finding restrictive covenant reasonable where defendants expressly agreed that the restrictive covenant was "reasonable and necessary for the protection of" plaintiff's interests).

2.      CFO Squad Fully Performed Under the Agreements, Defendants Breached
        Their Restrictive Covenants, and CFO Squad Suffered and Continues to
        Suffer Harm as a Result of Defendants' Breaches

CFO Squad will also satisfy the remaining elements of its breach of contract claims, namely

that: (1) CFO Squad performed under the Agreements by continuing to employ Defendants and

paying them as senior executives; (2) nevertheless, Defendants breached their Restrictive

Covenants by servicing CFO Squad clients for the benefit of LMAM and soliciting and hiring

Company employees; and, (3) CFO Squad has been and continues to be damaged by Defendants'

breaches.

CFO Squad fully performed its obligations under the Agreements, including by paying

Defendants their compensation, including bonuses as applicable, and continuing to employ them

until they each submitted their resignation.

However, Defendants have not performed and instead breached, and continue to breach,

their Restrictive Covenants by servicing and soliciting CFO Squad clients, wrongfully hiring and

soliciting CFO Squad employees (including Cena), and using the confidential information they

learned by virtue of their employment with the Company.

McPherson and Mushak formed LMAM as a direct competitor to CFO Squad on August

10, 2025, prior to each's resignation becoming effective on August 29, 2025, and September 15,

2025, respectively.  Cena then joined LMAM nearly immediately after her resignation became

effective.  Shortly after McPherson and Mushak departed CFO Squad, if not before, LMAM began

servicing clients of CFO Squad in breach of the Agreements.

CFO Squad is aware that Defendants are rendering services to clients of CFO Squad

because certain clients have attempted to send Defendants emails at their old CFO Squad email

addresses in the course of discussing business with LMAM.  Further, certain of CFO Squad's

clients have notified CFO Squad that McPherson or Mushak would continue to provide services

or requested CFO Squad's stamp of approval in that regard. CFO Squad is thus aware that Defendants are providing services similar to or the same as the types of services CFO Squad was providing to at least four clients of CFO Squad: (1) NRx Pharmaceuticals, with whom Mushak and Cena worked while at the Company; (2) Client #2, with whom Mushak worked while at the Company; (3) American Clean, with whom McPherson worked while at the Company; and, (4) Dickerson, with whom McPherson worked while at the Company. By servicing these clients—and, as discovery will likely confirm, by soliciting them—Defendants are in flagrant breach of their Restrictive Covenants.

In addition to servicing and/or soliciting clients, Defendants breached their non-hiring covenants by hiring Cena. McPherson also breached such Restrictive Covenant by soliciting Mushak (or vice versa). Further, at least one additional employee, Logan Schmitz, who has close ties to McPherson, has resigned since Defendants left to go to LMAM and it is believed he has or will be joining LMAM. CFO Squad also has reason to believe that Defendants have contacted other employees about their employment with CFO Squad. These actions are unmistakable and willful breaches of the Covenant Agreements.

Moreover, Defendants have breached the Restrictive Covenants by using confidential information obtained by virtue of their roles at the Company for improper purposes, including to compete with CFO Squad. McPherson and Mushak, as members of the executive team, were given access to confidential client lead lists. McPherson and Mushak were also provided access to certain confidential engagement letters and proposals, specifically for the clients with which they worked, which contained full description of client needs and services being offered along with CFO Squad employee rates. Defendants have breached their confidentiality obligations by using

this information for their own benefit, including to offer services to CFO Squad's actual and prospective clients.

Further, there is no question the Company has suffered significant, lasting damages as a direct and proximate result of Defendants' breaches. The Company invested resources, time and money into training its employees and developing customer relationships. But certain clients have already terminated their relationship with CFO Squad or reduced the services CFO Squad was providing to them, all in favor of LMAM, which has damaged CFO Squad not only in the amount of remaining 2025 anticipated revenues but revenues going forward indefinitely.

CFO Squad will also establish damages related to its cost of hiring and training employees. For example, CFO Squad invested in expanding its service capabilities for NRx Pharmaceuticals by hiring new director-level employees with specialized knowledge and incurring placement fees of approximately $85,000, which employees are now being under-utilized due to the loss of the NRx Pharmaceuticals business.

In contrast to the damages suffered by CFO Squad, LMAM has taken a short cut to profitability by avoiding the expenses of hiring and training employees, including with respect to servicing NRx Pharmaceuticals. CFO Squad has already lost a significant amount of business and talent and stands to lose a lot more if Defendants are not stopped from continuing their targeted attack on CFO Squad clients, which has already harmed the Company.

### B.    Plaintiff Will Suffer Irreparable Injury Absent Injunctive Relief

Turning to the most important requirement for issuance of a temporary restraining order and preliminary injunction—irreparable injury—absent a protective order, CFO Squad will continue to suffer immediate, irreparable injury as a result of Defendants' breaches because of:

(1) harm to client relationships and loss of good will; (2) loss of employee skills, expertise, and capacity; and, (3) further disclosure of CFO Squad's confidential information.

Here, it would be "very difficult, if not impossible, to calculate with any exactitude" the total value of CFO Squad's loss of the client revenues, including from the identified clients and prospective client, or to quantify the lost good will CFO Squad has built with those clients.  *See Karasaki*, at *41.  CFO Squad has suffered and will continue to suffer irreparable injury resulting from the loss of client relationships and good will absent injunctive relief.

Nor can monetary damages be accurately calculated or remedy in full the loss of trained employees, including those who have specialized client knowledge and relationships.  Such losses extend beyond the clients already targeted by Defendants given their work with various other clients in CFO Squad's roster.

Moreover, Defendants expressly acknowledged that violations of their Restrictive Covenants would entitle CFO Squad to injunctive relief to prevent breaches or threatened breaches of the Restrictive Covenants and to specific performance of each of the Restrictive Covenants. Himy Decl. Exs. B, D, F ¶4.  Such an acknowledgement furthers the conclusion that CFO Squad has suffered irreparable injury and is entitled to injunctive relief.

For these reasons, Plaintiff has established that it has and will continue to suffer irreparable injury if Defendants' conduct is not enjoined.

### C.    The Balancing of the Hardships Tips Decidedly in Favor of Injunctive Relief

The balancing of the hardships skews decidedly in Plaintiff's favor.  "When balancing hardships, "the Court 'must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood.'"  *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 472 (S.D.N.Y. 2001) (quoting *Ticor Title*, 173 F.3d at 69).  If

Defendants are not enjoined from further breaches, CFO Squad will continue to be vulnerable to losses of clients and employees, as well as loss of anticipated revenues through the end of year and untold revenues in the future. CFO Squad will also continue to suffer damage to client relationships and good will. At a minimum, CFO Squad will also face hardship if it "[f]ail[s] to receive the benefit of its bargain". *Cortland Line Holdings LLC v. Lieverst*, No. 5:18-cv-307 (TJM/DEP), 2018 U.S. Dist. LEXIS 233394, at \*32 (N.D.N.Y. Apr. 6, 2018).

The hardships to CFO Squad outweigh hardships, if any, to Defendants as a result of an injunction to enforce the Restrictive Covenants. In this regard, the Restrictive Covenants are narrow and do not prevent Defendants from working in the industry or even from forming or working for a direct competitor. Accordingly, the requested injunctive relief will likewise not prohibit Defendants from continuing to operate their new business, compete with CFO Squad and others for revenues, nor make new hires. The Restrictive Covenants merely prevent Defendants from servicing CFO Squad's clients with whom Defendants had involvement with by virtue of their employment with the Company and prevent them from hiring Company employees. Therefore, the threat of ongoing harm to Plaintiff far outweighs any harm to Defendants. *See, e.g.*, *Iannucci*, 2006 U.S. Dist. LEXIS 43339, at \*22 (defendant's imminent solicitation of work from plaintiff's clients supported by evidence of such solicitation establish "a hardship to defendant that is of a greater severity than that imposed on plaintiff"); *JTH Tax, Inc.*, 2019 U.S. Dist. LEXIS 116330, at \*21 (equities favored plaintiff where injunction enforced obligations to which defendant "freely agreed and in exchange for which [d]efendant received the benefits of the franchise arrangement"); *Cortland Line Holdings LLC*, 2018 U.S. Dist. LEXIS 233394, at \*32 (balance of hardships favored plaintiffs who hired defendant "with the understanding that he would not compete with [plaintiff] for two years after leaving the company.").

24

### D.    Granting CFO Squad Injunctive Relief Serves the Public Interest

Lastly, the public interest will be served by granting injunctive relief to CFO Squad.  An injunction to enforce the Restrictive Covenants serves the public interest by encouraging parties to abide by their contractual obligations.  *See Willis*, 550 F. Supp. 3d at 104 (quotation omitted); *Parrish*, 2025 U.S. Dist. LEXIS 183989, at *10 (finding public interest served); *JTH Tax, Inc.*, 2019 U.S. Dist. LEXIS 116330, at *22 (same).  Moreover, the public interest in protecting confidential information is served by enforcing the Restrictive Covenants, thereby encouraging employers to make investments in training key employees.  *See Syntel Sterling Best Shares Mauritus Ltd. v. TriZetto Group, Inc.*, 15 Civ. 211 (LGS), 2021 U.S. Dist. LEXIS 75875, at *44 (S.D.N.Y. Apr. 20, 2021); *Verizon*, 462 F. Supp. 2d at 662.  Given that the restrictive covenants and reasonable and narrowly drawn, there is no countervailing material public interest—even freedom of choice for clients—in allowing Defendants to solicit clients and employees of CFO Squad, nor to use CFO Squad's confidential information to do so.  Therefore, the public interest is served by issuing an injunction.

### E.    There Are Also Sufficiently Serious Questions Going to the Merits To Make Them A Fair Ground for Litigation and the Balance of Hardships Tips Decidedly in Plaintiff's Favor

While CFO Squad readily satisfies the likelihood of success standard, it can also demonstrate serious questions going to the merits of its breach of contract claims such that there exists a "fair ground for litigation" and that the balance of hardships tips decidedly in its favor.  *See Benihana, Inc.*, 784 F.3d at 895; *Five Star Dev. Resort Cmtys., LLC v. iStar RC Paradise Valley LLC*, No. 09 Civ. 2085 (LTS), 2010 U.S. Dist. LEXIS 25581, at *11-12 (S.D.N.Y. Mar. 18, 2010) (granting injunction having found plaintiff "made the necessary showing with respect to its breach of contract claim" under the "serious questions" standard).

There can be no excuse to justify Defendants' brazen conduct to steal clients and employees but, to the extent they put one forward or attempt to raise a different interpretation of the Restrictive Covenants, Plaintiff has still raised sufficiently serious questions as to the merits of its claims. *See, e.g.*, *AIM Int'l Trading, L.L.C. v. Valcucine S.p.A.*, No. 02 Civ. 1363, 2002 U.S. Dist. LEXIS 10373, *18-19 (S.D.N.Y. June 11, 2002) (finding conflicting accounts regarding the termination of a contractual relationships raised serious questions going to the merits to make them a fair ground for litigation); *Travellers Int'l AG v. Trans World Airlines*, 684 F. Supp. 1206, 1217 (S.D.N.Y. 1988) (finding plaintiff demonstrated sufficiently serious questions going to the merits despite the parties offering different interpretations of a key contractual provision). In particular, the number of impacted clients and employees calls into question any potentially proffered excuse by Defendants.

Additionally, as explained above, *see supra* Section C, the balance of hardships tips decidedly in CFO Squad's favor. If Defendants' conduct is left unfettered, CFO Squad will continue to suffer the loss of clients and untold future revenues. In contrast, Defendants stand to suffer relatively little hardship by being held to their valid contractual obligations. *See, e.g.*, *Five Star Dev. Resort Cmtys.*, 2010 U.S. Dist. LEXIS 25581, at *18; *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 436 (2d Cir. 1993) ("[T]he balance of the equities in this case tips decidedly in favor of appellant being granted specific performance of its contract because neither Eagle Sales nor the four new dealers will suffer harm proportionate to appellant's loss of business as a result of a status quo injunction."). Accordingly, CFO Squad also meets this alternative basis for granting injunctive relief.

### F.      Plaintiff Should Not Be Required to Post a Bond

Defendants expressly agreed that CFO Squad would not be required to post bond or other

security in order to be entitled to injunctive relief.  Himy Decl. Exs. B, D, F ¶4.  District courts

have broad discretion to dispense with the Fed. R. Civ. P. 65(c) bond requirement.  *See Doctor's*

*Assocs. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997).  As Defendants contractually waived the

bond requirement, the Court should not require a bond.  *See IBM v. De Freitas Lima*, No. 7:20-cv-

04573 (PMH), 2020 U.S. Dist. LEXIS 161532, at *48 (S.D.N.Y. Sep. 3, 2020) (finding waiver of

bond requirement in restrictive covenant valid and collecting cases); *Iannucci*, 2006 U.S. Dist.

LEXIS 43339, at *23 n.4.

## II.    THE COURT SHOULD GRANT THE COMPANY'S REQUEST FOR EXPEDITED DISCOVERY IN ADVANCE OF A PRELIMINARY INJUNCTION HEARING

The Court should permit Plaintiff to take expedited discovery in advance of the hearing on

Plaintiff's motion for a preliminary injunction.  "Requests for expedited discovery are typically

appropriate in [c]ases involving requests for preliminary injunction."  *In re Keurig Green*

*Mountain Single-Serve Coffee Antitrust Litig.*, 14-MD-2542, 2014 U.S. Dist. LEXIS 206287, at

*22 (S.D.N.Y. July 23, 2014).  Moreover, courts in this District routinely grant expedited discovery

in cases involving breach of restrictive covenants.  *See, e.g.*, *Mercer Health & Benefits LLV v.*

*Brown, et al.*, No. 1:22-cv-03844, Doc. 50 (S.D.N.Y. May 25, 2022) (granting expedited discovery

in case alleging breaches of non-solicitation and confidentiality agreements); *Intrepid Financial*

*Partners, LLC v. Fernandez*, No. 1:20-cv-09779, Doc. 32 (S.D.N.Y. Nov. 30, 2020) (same).

Most courts in this District apply a "flexible standard of reasonableness and good cause"

when analyzing a request for expedited discovery.  *See, e.g.*, *Malibu Media, LLC v. Doe*, No. 15

Civ. 3137 (LGS), 2015 U.S. Dist. LEXIS 193729, at *1 (S.D.N.Y. May 28, 2015) (citations

omitted); *Lagrange v. Knoedler Gallery*, 11 Civ. 8757 (PGG), 2011 U.S. Dist. LEXIS 163035, at

*10-11 (S.D.N.Y. Dec. 23, 2011). While the flexible "reasonableness" standard is applied "[f]or the most part" (*Digital Sin, Inc. v. Does 1-17*, 12 Civ. 3873 (JMF), 2012 U.S. Dist. LEXIS 78832, at *11 (S.D.N.Y. June 5, 2012)), some courts still apply a four-factor test established in *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982), which considers: (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted. *Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.,* 94 Civ. 5620 (JFK), 1994 U.S. Dist. LEXIS 18457, *7 (S.D.N.Y. December 28, 1994). However, courts have found the four-factor test particularly *inappropriate* when expedited discovery is requested in advance of a preliminary injunction because the factors are similar to the preliminary injunction standard itself. *See Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 326-27 (S.D.N.Y. 2005). Nevertheless, Plaintiff's request for expedited discovery meets either standard.

Plaintiff anticipates serving narrowly tailored discovery to uncover further evidence of breach, which will streamline a preliminary injunction hearing and help to avoid further irreparable injury. *New York v. Griepp*, 17-CV-3706 (CBA) (JO), 2017 U.S. Dist. LEXIS 113505, *4 (E.D.N.Y. July 20, 2017) (expedited discovery in advance of a preliminary injunction hearing was "entirely reasonable" as it was limited to documents that Plaintiff intends to use at the hearing); *Russell Reynolds Assocs., Inc. v. Usina*, 23 Civ. 2369 (JHR), 2023 U.S. Dist. LEXIS 79149, at *2 (S.D.N.Y. 2023) ("Requests for expedited discovery are typically appropriate where they 'would better enable the court to judge the parties' interests and respective [chances] for success on the merits at a preliminary injunction hearing.'" (internal citation omitted)).

Plaintiff has shown a likelihood of success on its claims against Defendants for breach of the Agreements and that it will suffer irreparable harm absent injunctive relief. Further, there is a direct connection between expedited discovery and the avoidance of irreparable injury. Absent expedited discovery, Plaintiff would face significant prejudice as it would have no way of determining in the immediate term the identities of other employees and clients targeted by Defendants. To the extent that Defendant has already solicited other Company employees who have not yet provided notice of their resignation, those employees continue to have the ability to further LMAM's interest unfairly and in breach of their duties to the Company. Such circumstances warrant expedited discovery. *See Fid. Info. Servs. v. Katz*, 1:09-CV-766 (LEK/DRH), 2009 U.S. Dist. LEXIS 150674, at *18 (N.D.N.Y. Aug. 4, 2009) (granting expedited discovery where plaintiff sought discovery to "develop a clearer picture of the full scope" of defendant's conduct). Defendants cannot credibly assert they will suffer injury by having to produce documents or information related to their breaches. Therefore, all of the factors under either standard are met.

Accordingly, the Court should grant Plaintiff's request for expedited discovery.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its Motion pursuant to Fed. R. Civ. P. 65 for a temporary restraining order and preliminary injunction against Defendants and grant Plaintiff leave to take expedited discovery.

Dated: October 21, 2025
       New York, New York

Respectfully submitted,

**DAVIS+GILBERT LLP**


By:  */s/ Daniel A. Dingerson*
  Daniel A. Dingerson
  Danielle C. Zolot
  1675 Broadway
  New York, NY  10019
  Telephone: (212) 237-1488
  Facsimile: (212) 468-4888
  ddingerson@dglaw.com
  dzolot@dglaw.com

  *Attorneys for Plaintiff*
  *THE CFO SQUAD, LLC*

## WORD COUNT CERTIFICATION

I certify that this Memorandum of Law complies with the applicable limits, excluding the parts exempted by Local Rule 7.1(c).  In preparing this certification, I have relied on the word count of the word-processing system used to prepare this Memorandum.  This Memorandum contains 8,696 words.

Dated: October 21, 2025

By: */s/ Daniel A. Dingerson*
Daniel A. Dingerson
1675 Broadway
New York, NY  10019
Telephone: (212) 237-1488
Facsimile:(212) 468-4888
ddingerson@dglaw.com

*Attorneys for Plaintiff*
*THE CFO SQUAD, LLC*